**LOWER NUECES RIVER WATER SUPPLY DISTRICT, Appellant,**

v.

Natalie M. COLLINS et al., Appellees.

No. 13837.

Court of Civil Appeals of Texas.

San Antonio.

Jan. 17, 1962.

On Second Motion for Rehearing May 2, 1962.

---

Fischer, Wood, Burney & Nesbitt, C. Burtt Potter, Corpus Christi, Joseph C. Ternus, Sinton, Reese Wade, Beeville, for appellant.

Morrill & Patton, Beeville, William B. Moss, Sinton, for appellees.

BARROW, Justice.

This is a suit by Natalie M. Collins and others, as plaintiffs, against the Lower Nueces River Water Supply District, as defendant, to recover damages resulting from the inundation of their land, consisting of 1,217 acres, in the reservoir created by the Wesley Seale Dam. The defendant by cross-action sought condemnation. The jury returned a verdict for $346,680.00, upon which judgment was rendered. From that judgment the defendant has appealed. Sometime prior to March 21, 1959, the Lower Nueces River Water Supply District filed condemnation proceedings against Natalie M. Collins et al., but before the hearing was had before the Commissioners, an agreement was made between the parties, that in view of title questions that might be raised, if the District would pay to the Collins landowners a sum of money equivalent to the amount of the highest award of its appraisers, the landowners would file suit against the District in the District Court of San Patricio County, and the District would then cross-act for condemnation, so that the entire controversy might be determined in the District Court. It was further agreed that the payment by the District would be in lieu of the deposit required under Article 3269, Vernon's Tex.Civ.Stats., and such amount would be credited against any final judgment.

Thereafter, on the 21st day of May, 1959, Natalie M. Collins, Bryant M. Collins Natalie Collins Curry and husband, Demra Collins Trube and husband, and Beverly Collins Meyer and husband, as plaintiffs, filed suit in the District Court of San Patricio County, naming the District as defendant, alleging that it had inundated their land consisting of 1,217 acres, and praying for damages.

Thereafter defendant filed its answer and cross-action seeking to condemn an easement to inundate the surface of plaintiffs' land lying above the 75-foot elevation contour line or, in the alternative, the fee to such surface. The defendant did not condemn the minerals. In the cross-action defendant pleaded that it had theretofore acquired from the City of Corpus Christi an easement from Natalie M. Collins and husband to the City of Corpus Christi, dated July 31, 1929, granting the rights therein specified, and alleged that the easement sought in this suit was in addition to such previously granted easement. The old easement, among other things, gave the City

the right to inundate plaintiffs' land in the reservoir of the Mathis Dam with the normal water level not to exceed seventy-five feet above mean sea level.

Plaintiffs' First Supplemental Original Petition alleged that the old easement granted by Natalie M. Collins and husband to the City of Corpus Christi had "terminated by its own terms and by operation of law, and is no longer in force or effect for any purpose whatsoever," and that the defendant was not entitled to assert any rights thereunder. By trial amendment, plaintiffs pleaded more in detail their asserted reasons why the former easement had expired. The parties stipulated that the date of taking was the day following the closing of the gates of the Wesley Seale Dam on May 8, 1958.

The area of the land that lay above the 75-foot elevation consisted in part of three islands, and in part of other land which lay outside the original reservoir. It was stipulated that the islands contained 228 acres, and the other portion 150 acres. The area below the 75-foot elevation contained 840 acres. It was the right to inundate the 378 acres above the 75-foot elevation that the District sought to condemn. Plaintiffs asserted the right to recover damages for putting additional water on the area below the 75-foot elevation, including damages to the minerals. The effect of the Wesley Seale Dam would be to raise the water to 94 feet above mean sea level and inundate all of the 378 acres.

The appellant, defendant below, by its first point contends that the court erred in admitting in evidence plaintiffs' Exhibit No. 54, being a plat showing the islands subdivided into lots. By its second point, appellant assigns as error the court's action in admitting in evidence plaintiffs' Exhibit No. 55, being a plat of the islands subdivided into lots and colored according to their desirability.

The record shows that these plats were made by tracing a map of these islands and marking off the acres into lots. The plats showed a causeway leading from the mainland to a road which proceeded around the perimeter of Island No. 1. There were other causeways leading to Islands Nos. 2 and 3, with roads around their perimeter. On each side of the roadways the area is marked off into lots. One row of lots has water frontage and another row has no water frontage. However, at regular intervals an open roadway or space is left between waterfront lots for the proposed owners of the interior lots to get down to the water. At the end of each roadway a proposed pier or boat dock is drawn on the plat. In the center of Islands Nos. 1 and 2, there is an area which is not divided into lots. These plats were prepared by appellees' witness Bailey Cox, who testified that the actual drawing was done by one Alvin Fluery, an expert draftsman. There was no survey made on the ground. The islands have never been subdivided but are still in raw acreage. The record does not show just when these plats were made, but it is obvious that they were made for use in the trial of the case. The plat introduced as Exhibit No. 55 is a duplicate of Exhibit No. 54, except that all of the lots having lake frontage have been colored according to Cox's idea of their desirability for residences or campsites. The most desirable are colored in red, the next in green, and the least desirable in blue. There seem to be 367 lots in all; 209 are lakefront and 158 are inside lots. Of the lakefront lots, 96 are in red, 78 in green, and 35 in blue. All of the inside lots were left uncolored. Cox testified that it was planned to reserve them for future sales. These plats were admitted over appellant's objection, however, the trial court admitted them for the limited purpose of showing the adaptability of the land for subdivision purposes. We are of the opinion that these plats, under the record in this case, were not admissible for any purpose.

One of the most hotly contested issues in the case was whether or not these islands were adaptable for subdivision purposes. Appellant's contention was that they were

not, and that their highest and best use was for agricultural and grazing purposes, the only use to which the islands had ever been put. It is undisputed that these islands were raw acreage land, unsubdivided, except in the minds of the drafters of these plats.

It has been repeatedly and consistently held, that where the property condemned is raw acreage it is not proper to admit in evidence hypothetical plats of non-existent subdivisions, the reason being that they tend to cause the jury to value the land as lots. The jury is to value the tract of land, and that only. They are not to determine how it could best be divided into building lots, nor to conjecture how such lots could best be sold, nor for what price. Opinion testimony as to the value must be based upon the value of the land as an entirety and not in parcels, unless there is some reason to value it in parcels, such as differences in the nature of the land. City of Austin v. Cannizzo, 153 Tex. 324, 267 S.W.2d 808; Silliman v. Gano, 90 Tex. 637, 39 S.W. 559, 40 S.W. 391; Continental Development Corp. v. State, Tex.Civ.App., 337 S.W.2d 371; Minyard v. Texas Power & Light Co., Tex.Civ.App., 271 S.W.2d 957; Dickey's Estate v. Houston Ind. School Dist., Tex.Civ.App., 300 S.W. 250; Denison & P. S. Ry. Co. v. Scholz, Tex. Civ.App., 44 S.W. 560; Davidson County Board of Education v. First American Nat. Bank, Trustee, Sup.Ct.Tenn., 301 S.W.2d 905; Pennsylvania S. V. R. Co. v. Cleary, 125 Pa. 442, 17 A. 468. The rule is subject to the exception that such plats are admissible in evidence where they are relevant to prove some issue in the case and are limited to that purpose. Coastal Transmission Corp. v. Lennox, Tex.Civ.App., 331 S.W.2d 778; City of Austin v. Cannizzo, supra. But this case does not come within the exception. In this case there was not, and could not have been, any dispute that these islands could be divided into lots, blocks, streets and alleys. Simply by the use of a map thereof, and a pencil and ruler, they could have been di-

vided into as many lots of as many shapes and sizes as the draftsman might imagine. We are of the opinion that the introduction of these plats would cause the jury to value this property by lot rather than what the entire tract would sell for under the market value rule. We think the court erred in admitting them. Moreover, we are of the opinion that the error was harmful to appellant. When the colored map was shown to the jury, showing the desirability by colors, the record shows that appellees' witnesses geared all their opinions as to the value of the land to these plats, thus valuing the land by the number of lots shown and the prices for which they would sell. The hypothetical subdivisions were particularly injurious to appellant in this case, because prior to their introduction Bryant Collins, one of the joint owners of the land, testified that it was, and for a long time had been, the intention of the owners of these islands to subdivide them and sell them out as lots. Thus, the normal reaction of the jury was to see how much profit the owners could make, over and above expenses, by selling the lots at retail.

Appellees contend that they did not offer any evidence as to the value of the lots, but inquired only as to the value of the land by the acre, and that any damage to appellant was caused by its cross-examination of the witnesses. We do not agree. It is true that on direct examination appellees did not ask the witnesses directly for a valuation of the lots in money, but at the conclusion of direct examination of the witness Cox the jury had before them a picture of these islands divided into 367 lots, 209 of which were lakefront and highly desirable for restricted residence property. They had before them a calculation of how many of those lots could be cut out of an acre of land, and estimates of the cost of paved roads, causeways, piers, boat docks, and other probable expenses of actually subdividing, promoting and selling the property. All that was left to be done was a mere matter

of calculation. It is true that appellant went more into the details on cross-examination than appellees did on direct examination, but we think the damage was done and appellant had the right to cross-examine the witnesses regarding these matters, and did not waive its objection by such cross-examination. Cathey v. Missouri, K. & T. R. Co., 104 Tex. 39, 133 S.W. 417, 33 L.R.A.,N.S., 103. It would be pure speculation to say what the jury's verdict would have been had these plats not been introduced, but, from the record as a whole, the conclusion is inescapable that their introduction, under the circumstances, was calculated to cause and probably did cause the rendition of an improper verdict and judgment. Rule 434, Texas Rules of Civil Procedure.

Appellant contends that appellees are not entitled to recover the market value of the three islands based upon their use for subdivision purposes, because at the time of the taking said islands had no market value for such purposes. In the alternative, it urges that the evidence is insufficient to show that the property had a market value for such purpose, and in a further alternative, that any evidence tending to show such value is too speculative and conjectural to support a jury finding. Appellant further contends that the court erred in including in the definition of market value, the following: " * * * taking into consideration all of the uses to which it is reasonably adaptable and for which it either is or in all reasonable probability will become available within the reasonable future." It urges that under the facts in this case, the instruction could only refer to the use of the property for subdivision purposes, because on the date of the taking it had become common knowledge that the Wesley Seale Dam would be constructed, and that the property of the appellees, as well as other lands along old Lake Mathis, below the 94-foot level, would be submerged. In that connection appellant contends that the court should have given its requested instruction that the highest and best use for said land was for agricultural and grazing purposes. Under the view we take of appellant's contention, we do not deem it necessary to separately discuss the various points.

The historical background of this controversy begins in the year 1929, when the City of Corpus Christi purchased an easement on the tract of land now owned in fee by appellees, for the obvious purpose of developing what has been known as Lake Mathis. That easement granted, among other things, the right to inundate all of the land up to 75 feet above mean sea level. This easement is now owned by appellant. Lake Mathis has been in existence since shortly after the original easement. The islands are above the 75-foot level and have never been flooded.

■ Appellant's contention is rather novel and is one of first impression in this State. At least, this exact contention, so far as we have been able to ascertain, has not been raised in any Texas case. Nevertheless, we are of the opinion that appellant's contention is without merit and cannot be sustained. The Supreme Court, in United States v. Chandler-Dunbar W. P. Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063, held that the value of property taken by eminent domain should be fixed as of the date of the proceeding and with reference to the loss the owner sustains, considering the property in its condition and situation at the time it is taken. The Court, in Murray v. United States, 76 U.S. App.D.C. 179, 130 F.2d 442, in passing upon the question here involved, said:

"The value of the land was to be determined as of the time of the taking. Danforth v. United States, 308 U.S. 271, 60 S.Ct. 231, 84 L.Ed. 240. And the duty of the jury was to fix the value without regard to any increase or decrease resulting from the government project. United States v. Chandler-Dunbar W. P. Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063."

Mr. Lewis Orgel, 1 Valuation, Under Eminent Domain, 2nd Ed., § 105, in discussing the question, said: "It would be manifestly unjust to permit a public authority to depreciate property values by threat to erect an offensive structure, and then to take advantage of this depression in the price which it must pay for the property." A statement to the same effect is found in 4 Nichols on Eminent Domain, 3rd Ed., 126. The Supreme Court of Pennsylvania, in passing upon the question, in Hermann v. North Pennsylvania R. Co., 270 Pa. 551, 113 A. 828, pointed out that to confer such a benefit on the taker would be "illegal confiscation * * * feebly disguised."

We think it is safe to say that the above stated rule is applicable in Texas. While we have not found any case in which the matter of depreciation of the value of property was involved, yet, in each case we have examined involving the advancement of the market value of property by reason of the improvement contemplated in the condemnation proceeding, it has been held that, where a person's entire property is included in a general proceeding of condemnation for a particular purpose, it is not permissible to consider that purpose or the result thereof in estimating the owner's compensation. State v. Vaughan, Tex. Civ.App., 319 S.W.2d 349; Housing Authority of City of Dallas v. Hubbard, Tex. Civ.App., 274 S.W.2d 165; City of El Paso v. Coffin, 40 Tex.Civ.App. 54, 88 S. W. 502, 505. In City of Austin v. Cannizzo, 153 Tex. 324, 267 S.W.2d 808, the Supreme Court had before it a case involving the condemnation, for school purposes, a tract of 4.57 acres of land out of a larger tract. One of the questions presented was whether the value of the 4.57 acres for commercial purposes, could be considered in the face of contrary zoning restrictions. The Court held that where it is shown that there is a reasonable probability that the prohibition or restriction will be modified or removed in the near future, the effect of such probability upon the val-

ue of the property may be considered. The Court said:

"In the willing seller-willing buyer test of market value it is frequently said that all factors should be considered which would reasonably be given weight in negotiations between a seller and a buyer. 29 C.J.S. Eminent Domain, § 159, page 1023. This would exclude consideration of purely speculative uses to which the property might be adaptable but wholly unavailable but would permit consideration of all uses to which the property was reasonably adaptable and for which it was, or in reasonable probability would become, available within a reasonable time. Orgel in his text on Valuation Under Eminent Domain, Vol. 1, § 30, p. 141, footnote 113, says: 'The test is well phrased in United States v. 3969.-59 Acres of Land (D.C.), 56 F.Supp. 831: "To warrant admission of testimony as to the value of land for purposes other than that to which it is being put at the time of the taking, it must first be shown: 1. That the property is adaptable to the other use. 2. That the other use is reasonably probable within the immediate future, or a reasonable time. 3. That the market value of the land has been enhanced thereby." ' "

■ Thus, if there was any doubt about the determination of the market value of the property as affected by the probable future uses, extending beyond the time when the property was taken, that doubt has been set at rest by the holding in the Cannizzo case. In valuing the land the jury must consider the use to which the land is adaptable in the future in its present condition, unaffected by the use to which it is to be put by the condemnor. The jury in effect was asked the question: What is the market value of these islands, considering all of the uses to which the property was reasonably adaptable on May

8, 1958, and for which it either is or in all reasonable probability will become available within the reasonable future? Surely, the question presupposed and assumed that the property would remain in the same condition and situation as it was on the date of the taking, unaffected by the project for which it was taken. To apply appellant's theory to the situation, the question would have meant: What would the willing buyer have been willing to pay for these islands on that date, for subdivision purposes, agricultural purposes, or any other purpose, assuming that tomorrow or the next day they will be submerged beneath nineteen feet of water? The answer would have to be, nothing. What we have said applies to appellant's contentions, as we understand them, both as to diminution of market value by reason of the threat of condemnation and to the destruction of any market value by the actual taking.

■ Appellees offered much evidence in the case for the purpose of showing the adaptability of these islands for subdivision purposes and uses as such. Pictures were introduced, showing the islands as they were at or about the time of the taking. They showed that while the islands were separated from the mainland and from each other by the waters of Lake Mathis, yet they are reasonably close to each other and to the mainland. There is evidence in the record showing the islands can be readily connected with each other and the mainland by bridges or causeways. There is evidence showing that at the time of the taking and for years prior thereto, there was an increasing demand for lake-front property, generally comparable to these islands, which affected the market value of such property for subdivision purposes. There is evidence showing that some time after September, 1952, a large portion of these islands was cleared and put in cultivation and was farmed during the years 1955, 1956, 1957 and 1958. The islands were reached by a causeway constructed by appellees. To further detail the evidence would unduly lengthen this opinion. We think it is fair to say that all the evidence, coming from all the witnesses, shows that notwithstanding the suitability or desirability of this property, on account of the imminence of the condemnation of this lake-front property during the years immediately prior to the date of taking, no one was interested in buying such property, either these islands or the shoreline property on the mainland. There were just no sales, for subdivision, agricultural, or any other purpose. Nobody wanted to buy property which was about to be condemned. The evidence is sufficient to authorize the jury, in passing upon the market value of these islands, to take into consideration their adaptability for subdivision purposes and their value for such purposes.

■ Appellant, by several points, contends that the court's definition of "market value" is on the weight of the evidence. We overrule that contention. The definition is proper under the evidence. The reference to the highest and best uses to which the property is adaptable covers both agricultural, as contended by appellant, and subdivision purposes, as contended by appellees. But, in view of another trial, we deem it proper to suggest that, upon proper objection, the method of submission of Special Issues Nos. 1 and 2, would be on the weight of evidence. The three islands contain 228 acres and the other land contains 150 acres. Appellant's theory is that the highest and best use of all the land is for agricultural and grazing purposes, while appellees' contention is that 210 acres of the islands has a highest and best use for subdivision purposes, and that the remaining 18 acres is agricultural or grazing land. We are of the opinion that when the court submits the issue of the market value of the 210 acres in one issue, and of the 168 acres in another issue, such issues would tend to indicate to the jury that the court is classifying the land.

Appellant contends that the court erred in submitting Special Issues Nos. 5 and 6 to the jury. These issues relate to the market value of the appellees' right of reversion of the 840 acres of land which have been continuously submerged under the 1929 easement. The basis of appellant's contention is that inasmuch as the 1929 easement continues for as long as appellant uses it for reservoir purposes, any testimony or finding as to the market value of such right of reversion would be too remote, conjectural and speculative to be the basis of a judgment. We agree with appellant.

The effect of this condemnation is to acquire the right to put an additional layer of nineteen feet of water upon that which is already there, and which appellant owns the right to keep there so long as it chooses to use the property for a reservoir. We agree with appellees that they have a right of reversion in the land. The question, however, is: What is the value of this right of reversion? The only effect of this condemnation is to make the remote possibility of a reversion even more remote. We think the holding of the Circuit Court of Appeals in People of Puerto Rico v. United States, 1 Cir., 132 F.2d 220, is applicable and controlling. In that case the Court said:

"We are aware of no rational means by which to determine the value of the possibility that at some indefinite time in the future the land might revert to the People of Puerto Rico. All that can be done is to venture a guess, and it is elementary law that damages cannot be assessed by mere guesswork."

All points not discussed are overruled. For the error above pointed out, the judgment is reversed and the cause remanded.

This Opinion was written by Associate Justice H. D. BARROW before his accident on December 22, 1961, and is now approved by Chief Justice W. O. MURRAY and Associate Justice JACK POPE.

On Second Motion for Rehearing

POPE, Justice.

On motion for rehearing by appellees, this Court severed and partially affirmed the trial court's judgment because appellant had made no assignments of error with respect to portions of the judgment. We altered our original judgment by affirming the award for oil, gas and minerals under all of the 1217 acres of land. We also affirmed the award for the surface estate of 168 acres lying above the seventy-five foot elevation and comprising a part of the pasture land, but not a part of the three islands. We affirmed the award for the surface estate of 840 acres below the seventy-five foot elevation, which was on occasions above the water and used in connection with the 168 acres of pasture land. Finally, we affirmed, with respect to the damages to crops and pumps in a former flood. While appellant preserved no points, it now has filed its motion for rehearing and urges that those awards are so hitched to the condemnation award about which it does complain, that a severance is not proper.

It quotes Phillips v. United States, 9 Cir., 243 F.2d 1, which says: "If we attempt to cut a condemnation proceeding into slices, it bleeds." Appellant also cites Eagle Lake Improvement Co. v. United States, 5 Cir., 160 F.2d 182, in which the Court states that surface lands for which a residential use is claimed is inconsistent with a claim for subsurface oil values. Hence, the two damages are so tied together that they can not be severed. See also, Phillips v. United States, 243 F.2d 1.

Accordingly, we withdraw the opinion we wrote on appellees' motion for rehearing. Our original opinion will stand, except that appellees will recover the sum of $8,320 as damages to crops and pumps in a former flood.

Costs are adjudged against appellees.