CITY OF LAFAYETTE *v.* HAROLD E. BEELER,
J. IRENE BEELER, AND LAFAYETTE SAVINGS BANK.

[No. 2-476A129. Filed November 9, 1978.]

*Gregory J. Donat, Richard T. Heide, Heide, Gambs & Mucker,* of Lafayette, for appellant.

*Paul Ewan, Schultz, Ewan and Burns,* of Lafayette for appellee.

SULLIVAN, J. — This appeal arose out of an action in eminent domain brought by the City of Lafayette, Indiana, on September 24, 1974, to condemn, for sewer easement purposes, a portion of property owned by Harold and Irene Beeler.

The property in question lies upon 11.02 acres of undeveloped land located adjacent to other land also owned by the Beelers which has been subdivided and developed. The area condemned for the easement is a strip running irregularly north-south for the entire length of the parcel, averaging approximately 37 feet in width. The strip consists of approximately 1.75 acres and lies on the western edge of the tract. The eastern edge of the parcel faces a developed street which terminates in a cul-de-sac. All paper work, engineering, profiles, surveying, field work on streets and storm drainage, and staking and elevating for sewers had been accomplished in anticipation of subdividing the land. Preliminary approval for the subdivision was attained in 1968, and was extended in 1971 for three years. The Beelers, however, had not received final approval for subdivision from the Area Plan Commission, nor had any plat been recorded. The land was taxed as "farm land" at the time of trial.

On November 6, 1974, the Court entered an order of appropriation and appointed three appraisers, who thereupon filed their report and assessed the Beelers' total damage at $31,000. Both the Beelers and the City filed exceptions to the report.

At trial, the Beelers introduced, over the City's objection, Exhibits Nos. 6 and 8, consisting of two plats, the former showing the land subdivided into lots before the taking and the latter showing the effect upon those lots created by the easement.

The Beelers also presented expert testimony with respect to "just compensation" for the property taken. Wendell Mason, using the "market data" approach (sales of similar properties), testified that he considered the highest and best use of the property to be Residential R-1. He further testified that he considered damages from the taking to be $76,000.

Upon preliminary questioning, counsel for the City inquired into the basis for Mason's fair market value determination. Mason admitted that he had appraised the land on a lot basis by applying a specific value

per lot as contemplated by the lot plan submitted by the Beelers. Mason further testified that he had calculated the damage to the remaining property by evaluating the effect the taking would have on each specified lot illustrated by the plat. Upon cross-examination, Mason further explained his appraisal:

"Q. You figured the value of 28 lots at $7500, right?

A. Right. When you asked me to break it down into an acreage cost I had a figure of $12,323.

Q. What you had done though was just take your original per lot basis and then break it down. You hadn't made any evaluation from similar sales of 11 acres or anything like that though? Your evaluation was just a . . . was just an arithmetical computation, right?

A. Right, based upon past development and history of the area.

Q. Now Mr. Beeler . . . I mean Mr. Mason, I'm sorry, the comparables which you used, were those all lots in legally recorded subdivisions?

A. They were.

Q. Were they all improved lots?

A. Part of them were, part of them weren't.

Q. Which ones were improved and which ones were not?

A. The lots in Canterbury are fully improved except for sidewalks. They have city water, city sewers, they have storm sewers, curb and gutters, blacktop streets.

Q. Well, are they improved . . . are they improved to the extent they are going to be improved?

A. Yes."

The Beelers' second expert witness, Eston Hupp, calculated damages at $67,500. Counsel for the City also inquired into the basis for his appraisal. The more revealing portions of his testimony are as follows:

"BY MR HEIDE:   Mr. Hupp, in determining . . . in your determination of the value of the Beeler property, did you make that determination by placing certain values on a per lot basis?

A. This valuation was based on the concept of highest and best use which was a subdivision . . . a potential subdivision, yes.

BY MR HEIDE: In making that evaluation did you use a specific plan for the development of that land?

A. Yes.

BY MR. HEIDE: And then did you place a value on the lots on that plan and then accrue those values together to a total value?

A. Basically that's the process although that's not quite correct.

BY MR. HEIDE: It was a specific plan though?

A. Yes, it was a specific plan.

BY MR HEIDE: Was it a plan that you understood had been accepted as a subdivision?

A. Well, I don't know that I understood ... it was in a preliminary stage, being preliminarily approved, but in my opinion it looked like the best design to build.

BY MR. HEIDE: But you did make it as to that specific future use of the land under that specific use of lots like the lots were sized, placed upon the paper, upon the land. Your evaluation was made with that specific future plan in mind, is that correct?

A. That is correct."

The Beelers' final expert witness was Robert Mennen, who assessed damages at $81,835. His appraisal was also based upon the assignment of values for each lot and then aggregating those values to arrive at a total acreage value. Various portions of his testimony were as follows:

"Q. What in your opinion was the fair market value of the 11.02 acres before the taking of the easement by the City of Lafayette?

BY MR. HEIDE: Might I ask some preliminary questions?

BY THE COURT: All right.

BY MR HEIDE: Mr. Mennen, in arriving at your figure, did you use a specific layout of lots for the Beeler property?

A. Yes sir, I did.

BY MR. HEIDE: Just turn around and ... was that layout there?

A. Yes, this one here, right.

BY MR HEIDE: Did you make your evaluation by giving each lot a certain value and then adding all the values together?

A. Yes, I did.

BY MR. HEIDE: And then that's how you arrived at the total value of the property then?

A. I did."

\* \* \*

"BY MR. HEIDE: Mr. Mennen, in arriving at this figure, did you assess or devaluate the property on a per lot basis?

A. Not completely.

BY MR HEIDE: To what extent did you base it on a per lot basis?

A. My arithmetic to arrive at this figure was based on the fact that 74, 73, 72, 71, 70 and 68 and 66 and 67 as well as 78, 82 and 83 would have an interim period of 8-10 years before they could be really built on. These properties up in the north of approximately five acres would have no damage as I could see so I couldn't put it on a necessarily per lot basis on that area, but these lots here have a holding period of 8-10 years that they can't be used.

BY MR. HEIDE: Was that holding period placed ... did you place the holding period of a per lot basis and then arrive at your figure?

A. Not on the ... I took the total amount of those lots and arrived at it.

BY MR. HEIDE: You mean you had a total amount ... you didn't place a value on each lot as damage?

A. I took the damage on this group of 11 lots then placed the damage on the whole.

BY MR. HEIDE: Was the damage equal to each of them?

A. It would be, except to 66.

BY MR HEIDE: So you did place it then ... on certain lots you placed a certain amount on some of them and one of them you damaged it in another way?

A. Yes. 66 I think I have $1000, so we damaged it about $6500, approximately.

BY MR. HEIDE: I'll object to this question and the answer for the reason that it calls for a . . . it uses a purported specific plat which portrays a specific future use . . . a proposed specific future use of the property to arrive at the evaluation."

Upon cross-examination, Mennen further testified:

"Q. Now you have placed a before value of $210,000 on the property, is that correct?

A. That's right, sir.

Q. How did you arrive at that figure?

A. I felt that 28 lots at current value of $7500, and that was my estimate of value.

Q. 28 lots at $7500? Do those 28 lots take up the whole 11.02 acres?

A. I believe so.

Q. So over here where there is no access you placed $7500 value on those just the same as you did over in here?

A. I projected the whole 11 acres into subdivision.

Q. If you hadn't projected that into a subdivision would it have been impossible to arrive at a figure of the amount?

A. I had to do that because it's the highest and best use of the property.

Q. Highest and best use is residential, R1, correct?

A. Right, sir.

Q. But you went beyond that and projected a specific layout of that 11.02 acres, is that correct?

A. I used the one that was already projected.

Q. The one that Mr. Beeler provided to you, is that correct?

A. That's right."

In appealing the jury verdict of $49,500, the City contends that the trial court erred in (1) admitting Exhibits Nos. 6 and 8 into evidence,

and (2) admitting the testimony of the Beelers' three expert witnesses due to their respective reliance upon a specific future use as evidenced by the plats and in their evaluation based upon a lot analysis.[1]

It is well-settled in Indiana that when land which is taken by condemnation has a fair market value at the time of its appropriation, the measure of damages is the fair market value for which the land could be sold if the owner were willing to sell and a buyer willing to buy, neither under compulsion to do so. *State v. Tibbles* (1954), 234 Ind. 47, 123 N.E.2d 170. Furthermore, if the land has a higher market value by reason of use or uses to which it may be adapted, but to which it had not been put, the owner is entitled to the greater value. *State v. City of Terre Haute* (1968), 250 Ind. 613, 238 N.E.2d 459.

The market value of the condemned land insofar as that value is presently enhanced by the property's *adaptability* for subdivision use may be shown, but the possible future value of each prospective lot may not be proven. *First National Bank of Mishawaka v. Penn-Harris-Madison School Corp* (1968), 250 Ind. 453, 237 N.E.2d 108; *Northern Indiana Public Service Co. v. Darling* (1958), 239 Ind. 237, 154 N.E.2d 881; *Ohio Valley Railway and Terminal Co. v. Kerth* (1892), 130 Ind. 314, 30 N.E. 298.

The use of a plat illustrating undeveloped land as subdivided lots is admissible only to show adaptability for residential subdivision as its best and highest use, *Southern Indiana Gas and Electric Co. v. Riley* (1973), 260 Ind. 643, 299 N.E.2d 173, and is not admissible where its purpose is to indicate a value if used in such a manner. *See Indiana v. Tri-State College* (1972), 258 Ind. 307, 280 N.E.2d 813.

Both parties stipulated at trial that the highest and best use of the undeveloped property was R-1 Residential.[2] It is therefore apparent from

---

1. The City presents its contentions in a three-pronged attack, citing error in the court's denial of a motion in limine, the overruling of objections and denial of motions to strike at trial, and refusal of instructions on the matter. We treat the substantive issues set forth by the above procedural claims together.

2. One of the Beelers' expert witnesses defined R-1 Residential as a category limiting each lot to a minimum of 10,000 square feet.

the record that the trial court erred in admitting Exhibit No. 8[3] and in allowing the Beelers' expert witnesses to testify concerning the aggregate value of hypothetical lots. The adaptability of the land for subdivision use after the stipulation was no longer in issue, and admission of the plat showing the tract subdivided into lots could only serve to mislead the jury in its determination of fair market value to ascertain damages.

Where both parties have conceded or agreed upon adaptability to the highest and best use of the land in question, the introduction of a plat showing the land as subdivided lots is merely cumulative and is subject to misconception by the jury, and should therefore be excluded by the trial court. *See Park Dist. of Highland Park v. La Salle National Bank* (1976), 36 Ill.App.3d 146, 343 N.E.2d 186; *Kaufman Northwest, Inc. v. Bi-Stone Fuel Co.* (Tex.Civ.App. 1975), 529 S.W.2d 281; *People ex rel Dept. of Public Works v. Princess Park Estates, Inc.* (1969), 270 Cal.App.2d 876, 76 Cal.Rptr. 120; *State v. Kohler* (1964), 268 Minn. 77, 128 N.W.2d 90; *Lower Nueces River Water Supply District v. Collins* (Tex.Civ.App. 1962), 357 S.W.2d 449; *But see Forest Preserve District of Cook County v. Tabin* (1969), 115 Ill.App.2d 267, 253 N.E.2d 99.

In *State v. Kohler, supra,* 128 N.W.2d 90, 93-94, the court stated:

"It is next contended by appellant that the court erred in excluding its exhibits in the form of plats or plans purportedly showing the feasibility of the use of the property for a community shopping center. The trial court rejected the offers because there was no issue on this point. The state conceded that the highest and best use of the property was for a shopping center and therefore there was no reason for their introduction."

To the same effect is *Park Dist. of Highland Park v. La Salle National Bank, supra,* 343 N.E.2d at 189, wherein the court stated:

"[W]e note that the Park Distict conceded that the highest and best use of the lots was single family residential and therefore the

---

3. The parties stipulated as to the land's adaptability only after Exhibit No. 6 had been introduced. Thus, technically that plat was properly admitted. But because any issue to which the plat would be relevant was thereafter disposed of, reliance upon it in subsequent testimony would be improper.

sole purpose of introducing the plat into evidence was to enhance the damages . . . ."

A stipulation by the parties as to highest and best use is to be distinguished from the situation in which there is only expert testimony concerning adaptability, for in the latter case the plat is more than cumulative in that it may provide a credibility base for the testimony of the expert witnesses. *See Flynn v. Commonwealth, Dept. of Highways* (Ky. App. 1968), 428 S.W.2d 24.

The trial court apparently viewed the plats as admissible to show adaptability to a specific and particular method of subdividing the land which was also contended to be its "highest and best use", thus going beyond the parties' stipulation.

As stated, evidence may be introduced to show adaptability to highest and best use. A landowner may not, however, introduce evidence illustrating a specific future use for purposes of proving damages. *State v. Hamer* (1936), 211 Ind. 570, 199 N.E. 589. The question presented in this case, upon which we have found little direct authority, is whether evidence may be introduced to show adaptability to a specific plan or layout of land which is also presented as illustrative of its best and highest use.

There appears to be a point at which the issues of adaptability and value merge. To introduce a plat or testimony to show subdivision capability is one thing; it is another to introduce evidence to show that a tract may best be divided into 20 lots of a particular dimension rather than 10, while thereafter proceeding to show how the taking affected those 20 lots. While the latter information may be of substantial interest to a prospective buyer, as a practical reality, such evidence, in our opinion, invites speculation to such a degree as to confuse and be misused by the jury in its determination of the fair market value of the whole tract. Thus, while valuation of undeveloped acreage takes into account the land's highest and best use in general terms, it does not contemplate dividing the parcel into hypothetical specific, identifiable lots. But see *Northern Indiana Public Service Co. v. McCoy* (1959), 239 Ind. 301, 157 N.E.2d 181, wherein a contrary view may have been espoused by the dissenting opinion:

"It follows that a *proposed method* of subdividing the land, as shown by any plat and how it can thus be *most effectively* subdivided to enhance its value, is a matter for consideration by the jury, . . ." 157 N.E.2d at 187 (Emphasis supplied).

We, however, would infer that the concept of "highest and best use" does not contemplate a specific plan. The following is supportive of that inference:

"[P]roperty is entitled to be valued for its 'best use' or its 'best available use.' That conception of course would be helpful to a jury since the jury is apt to be misled if the phrase 'value for a *particular* use' were employed." Alfred D. Jahr, *Eminent Domain: Valuation and Procedure,* p. 113 (1953) (Emphasis supplied).

As stated to a jury in *City of Philadelphia v. United States* (E.D. Pa. 1943), 53 F.Supp. 492, 494:

"[I]t is the market value of the entire tract that you must determine and not of the lots into which it might be divided. . . . You are not to determine how it could best be divided into building lots, . . ."

Also instructive is the following statement in *Condemnation in Indiana: Commentary and Forms,* pp. 86-87 (1966 Indiana State Bar Association):

"In determining the highest and best use the jury may not consider the value for a *specific* future use which the owner contemplated but may consider *in general* the market value for the type of highest and best use. *State v. Hamer* (1937), 211 Ind. 570, 574, 199 N.E. 589. For example, the jury may not consider the value of land for a *particular type* of manufacturing enterprise the owner intended to construct, but may consider the market value of the land for *general* business and industrial purposes." (Emphasis supplied).

The court in *State v. Tri-State College, supra,* 280 N.E.2d 813, 815, quoted 11 ILE Eminent Domain, (1958) as follows:

"It has long been the established rule in determining the value of property taken by condemnation or appropriation the availability and adaptability of the property for uses other than that to which it is applied at the time of taking, may be taken into consideration. The pre-existing use of the land is not the sole criterion by which its value is measured.

"However, it is equally well settled that the inquiry as to damages cannot go into an intended specific use, because such damages are speculative, and that such inquiry must be confined to the land with reference to its use and condition at the time of taking and not as to what use the owner might be contemplating to put it."

Nichols, in his treatise on eminent domain, has stated:

"[T]he owner may offer a plan showing a possible scheme of development for the purpose for which it is most available, provided it appears that the likelihood of demand for the property for that purpose is such as to affect market value. He cannot, however, go further and describe in detail to the jury a speculative enterprise for which in his opinion (or that of some expert) the land might be used, . . . ." 5 *Nichols on Eminent Domain* § 18.11[2], pp. 53-58 (1969).

In *State v. Maplewood Heights Corporation* (1973), 261 Ind. 305, 302 N.E.2d 782, defendant's expert witnesses also based their appraisal upon a lot division plan "which they regarded as being the best plan for utilizing the land remaining after the appropriation." 302 N.E.2d at 784. Our Supreme Court stated with reference to such evidence:

"The testimony should have been objected to upon the basis that it was speculative and likely to mislead the jury, in that it treated the land as developed residential lots, rather than as undeveloped or partially developed land having residential lot development as its highest and best use." 302 N.E.2d at 785.

The Court, however, further commented as follows:

"Unquestionably, the process utilized by the witnesses was basically the same as that which a prudent developer would employ to arrive at the price he would pay for land to develop. Properly guarded, we think such evidence could be presented by way of explaining the basis for the appraisal. In eminent domain proceedings, it is proper to take into consideration all facts that an ordinarily prudent man would take into account before forming a judgment as to the market value of the property he contemplates purchasing. *Gradison v. State* [1973], [260] Ind. [688], 300 N.E.2d 67. The court, however, should be very cautious in receiving such testimony, to be certain that it is presented in proper context, always remembering that the issue is the fair market value on the date of the appropriation. The use to which land may reasonably be devoted is a factor that bears upon its value, although it may never have been put to that use." 302 N.E.2d at 785.

Much more recently, in *State v. Church of Nazarene of Logansport* (1978), 268 Ind. 523, 377 N.E.2d 607, 612, our Supreme Court, as in *State v. Maplewood Heights Corporation, supra,* rendered a cautious acknowledgement that in some circumstances a lot evaluation of undeveloped land may be appropriate:

> "For example, a ten acre parcel of land susceptible of being sub-divided into streets and twenty home sites having a value of $5,000 each may not be appraised as twenty home sites having a total value of $100,000. This is true, simply because the ten acre parcel is raw material, not the finished product, and it must be appraised as raw material. Nevertheless, if the same ten acre parcel was suscepti-ble of being utilized as ten home sites, without encountering development expenses, and each such lot would have a market value of $5,000, the total value would properly be arrived at by totaling the value of the ten lots — $50,000. This, of course, presupposes a ready market for the ten lots at the price of $5,000 each. Under such circumstances, it would not be required that the land be valued at the price it would bring if sold as one unit. Multiple sales may be anticipated, so long as in so doing, the enterprise does not take on the form of a business venture entailing capital, skill, risk, pro-fit and other such elements that combine to determine the price of the finished product.
>
> "Thus, we see no error in the method of valuation used by the witness, Wade, provided she was considering the land as it was on the day of the take."

The line of demarcation between those circumstances in which testimony of specific intended use and lot by lot evaluation is admissi-ble, and those circumstances under which it is not, is too finely drawn for us to follow. We remain uninstructed as to the appropriate method for "properly guarding" such evidence so as to allow its admission. In the case at bar, the trial court merely cautioned and instructed the jury that such evidence was to be considered only for adaptability purposes, an issue not in dispute. The Court did not confine consideration of testimony concerning hypothetical lots to an explanation of the witnesses' appraisal, rather than for determination of substantive issues. *See Gradison v. State* (1973), 260 Ind. 688, 300 N.E.2d 67.

Furthermore, apart from the reliance on the specific plats, we are of the belief that the expert witnesses erroneously calculated their total

acreage value for the tract by aggregating individual values of hypothetical lots, both before and after the taking.

In *Southern Gas and Electric Co. v. Riley, supra*, 299 N.E.2d at 175, the court warned against the very practice utilized by the appraisers here when it stated concerning the admission of such evidence:

"It should not have been used as evidence that the land consisted of 'x' number of developed lots, each having a fair market value of 'y', because such would have been grossly erroneous and misleading to the jury."

As also stated in *State v. Tri-State College, supra*, 280 N.E.2d at 814:

"A witness may testify that his appraisal of the property is based upon a use of the same where there is a reasonable likelihood of its use for that purpose in the near future. Such definite future use adds present value to the site. However, a witness may not present a specific layout, as if the use and change were presently in existence, and ask that the value based upon such plans and specifications be taken into consideration. See *State v. Tibbles et al.* (1954), 234 Ind. 47, 123 N.E.2d 170."

We therefore reverse and remand for a new trial consistent with the determinations made herein.

Buchanan, C.J. and

Shields, J., concur.

NOTE — Reported at 381 N.E.2d 1287.