THE CITY OF HARLINGEN,
Appellant,

v.

The ESTATE OF David J. SHARBO-
NEAU, Deceased, Lois Sharboneau,
Individually and as Independent Exec-
utrix of the Estate of David J. Sharbo-
neau, Deceased, Appellee.

No. 13–97–874–CV.

Court of Appeals of Texas,
Corpus Christi.

Aug. 26, 1999.

Rehearing Overruled Sept. 23, 1999.

Roger W. Hughes, Adams & Graham, Brendan Hall, Harlingen, for Appellant.

Carlos Raul Cortez, Dallas, Phillip Ray Crecelius, San Antonio, Stewart Hyer

Thomas, Beckham & Thomas, Dallas, for Appellee.

Before Chief Justice SEERDEN and Justices HINOJOSA and YAÑEZ.

## ON MOTION FOR REHEARING

Opinion by Chief Justice SEERDEN.

The original opinion of the Court is withdrawn and the following is handed down on rehearing.

Appellant, City of Harlingen, sought to condemn property owned by the Estate of David J. Sharboneau, deceased. After agreeing that there was a public need to acquire the property, the court proceeded to a hearing to determine the fair market value of the property. After this hearing, the court awarded the Estate $232,000 and rendered judgment accordingly. In this appeal, the City contends that: (1) the trial court erred in admitting expert testimony because the expert's testimony was incompetent and his methods were improper; (2) the trial court erred in finding that appellant owed an assessment equal to the value of the land put to its highest and best use; (3) there was legally and factually insufficient evidence to support the judgment; and (4) the trial court erred in admitting testimony related to the purchase prices of the disputed tracts. We affirm.

### Factual Summary

Lois Sharboneau, executrix of the Estate of David Sharboneau, began purchasing tracts of land in a particular area of Harlingen in approximately 1972. Between 1972 and 1979, she acquired 9.85 acres in five separate, adjacent parcels. After purchasing the tracts, Sharboneau had the existing homes on the tracts removed, but did not remove other existing improvements.

Prior to a trial to the court, the parties stipulated that the highest and best use of the property was for development as a "single house development." The only is-

sue for the court was the fair market value of the property. Joe Patterson, a real estate appraiser with extensive appraisal experience in the Rio Grande Valley testified for appellee. He stated his opinion that the value of the condemned property, when used for its highest and best purpose, was $296,620. Patterson used what he termed the "subdivision development" method to reach his conclusion. According to his testimony, this approach requires the appraiser to determine the projected sales proceeds for the sale of developed property. The estimated development costs, expenses, and the developer's profit are deducted from the proceeds to achieve a net value, which is regarded as the fair market value of the property when sold for subdivision development.

The City's appraiser, Jesse Watson, used a comparable sales method to determine the fair market value of the property. In reaching his conclusion, Watson compared the prices paid for what he considered three relatively similar tracts located in Harlingen. However, Watson stated that finding exact comparables is often impossible. Thus, he was required to make adjustments for significant differences between the tracts. He concluded that the value of the unimproved, raw land was $98,500.00.

The court's findings of fact state that the highest and best use of the land is for development as a residential subdivision. The testimony adduced at trial shows the land is open land. The appraisal report also notes that utilities and services are connected to the site; public telephone, electrical, and gas services are available to the site; and easements have been granted over the site for road and utility services.

## I. Reliability, Admissibility, and Competency of Appraisal Testimony

■ By its first issue, the City contends that the expert testimony submitted by the estate was unreliable, inadmissible, and incompetent, and thus cannot support the trial court's finding. Primarily, the City asserts that Patterson's testimony was based upon an invalid methodology and incompetent data.

The City's argument on this point raises a threshold question regarding the extent to which the court may rely upon the determination that the highest and best use of the land is for single-family residential subdivision development. By its argument, the City suggests that, regardless of the potential uses for the land, the determination of value is inextricably related to the current status of that property. This view is unnecessarily limited. Implicit in the notion that a particular parcel of land has a highest and best use, is the notion that a buyer and seller would only consummate a sale of the land for that purpose. In other words, land which is best used as farmland is unlikely to be bought by an individual seeking to build a skyscraping commercial enterprise. Likewise, land which is best used for a skyscraper is unlikely to be sold as farmland. The concept of valuation must consider these realities.

Moreover, the fact that the land in question is not being put to that use in the present should not foreclose consideration of the potential uses to which that land may be put. An individual who holds a parcel, not unlike this one, upon which she decides to grow hay, may be aware that the land can be put to a different use, such as residential subdivision development, but may nevertheless choose, for the time being, to continue to grow hay. Regardless of the reason, so long as the value of the land when put to its highest and best use is reasonably ascertainable, and therefore not the subject of mere speculation, assigning a value according to the reasonable potential use is consistent with the concept of fair market value.

Appellant correctly asserts that the basis for an expert's testimony must be reliable to be admissible. *See* TEX.R. EVID. 702; *Gammill v. Jack Williams Chevrolet,*

972 S.W.2d 713, 726 (Tex.1998); *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556–57 (Tex.1995). The trial court has broad discretion in determining admissibility, and we will reverse only if there is an abuse of that discretion. TEX.R. EVID. 104(a); *Robinson,* 923 S.W.2d at 558; *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). In *Robinson,* the court noted six non-exclusive factors which may be considered to determine the admissibility of expert testimony. 923 S.W.2d at 557. However, as the *Gammill* court recognized, there are situations in which the *Robinson* reliability factors may be inapplicable. *See Gammill,* 972 S.W.2d at 720, 726. The court used the beekeeper analogy espoused by the Sixth Circuit to demonstrate the difference.

> If one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness. Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee. Conceivably, even if he had never seen a bumblebee, he still would be qualified to testify, as long as he was familiar with its component parts.
>
> On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness if a proper foundation were laid for his conclusions. The foundation would not relate to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have.

*Id.* at 724–25. As with the other situations discussed in *Gammill,* here Patterson's testimony is more like the hypothetical beekeeper's than the engineer's. Patterson testified that he had performed many appraisals in the Rio Grande Valley over a period of twenty years. During this time, he had appraised many different types of property, including single-family residences and land developments. Patterson graduated from Baylor University, where he received real estate training. His report indicates that he was licensed by the State of Texas as a General Real Estate Appraiser at the time of this appraisal. Patterson associated himself with several professional groups and had taught real estate appraisal courses at Hill Junior College and Baylor University. He stated that he had used the subdivision development method of appraisal on many other occasions.

Certainly, there are scientific components to real estate appraisal, but Patterson's understanding of the fundamental principles of his practice were presented to the court during the direct examination. His qualifications were placed into evidence as well. We cannot say that the trial court abused its discretion as a "gatekeeper" in accepting Patterson's qualifications and testimony.

According to the *Gammill* court, beyond the expert's qualifications, his opinion and methods must still be reliable. In his report, which was received into evidence by the court, Patterson, at some length, describes his method and its general utility in the appraisal process.

Patterson's study includes an initial examination of the demographic and economic prospects for the Lower Rio Grande Valley. Patterson then examined the feasibility of subdividing the Sharboneau tract. He measured the property area at approximately 9.852 acres. He concluded the property could be subdivided into forty-four single-family residential lots, averaging about 7,700 square feet each. Patterson described his methodology:

> The average lot sizes and total number of lots noted above have been estimated from utilizing existing subdivisions in the market area. For example: Knightwood Estates Subdivision, No. 4 has a total of 11.408 acres with 61 total lots averaging 6,793 square feet each. This

calculates to 5.34 lots per acre. Knightwood Estates Subdivision, No. 3 has a total of 17.830 acres with 79 total lots averaging 7,700 square feet each. This calculates to 4.43 lots per acre. North Pointe Subdivision has a total of 8.809 acres with 39 total lots averaging 7,147 square feet each. This calculates to 4.43 lots per acre. With this information, the appraisers have estimated the subject proposed subdivision could achieve 44 total lots averaging approximately 7,700 square feet each.

Patterson described the basis for reaching these conclusions. First of all, Patterson examined the concept of "highest and best use." He stated that highest and best use is defined as "the reasonable and probable use that will support the highest present value, as defined as of the effective date of the appraisal." He alternatively defined highest and best use as "that use, from among reasonably probable legal alternative uses, found to be physically possible, appropriately supported, financially feasible and that results in highest present land value." Patterson acknowledged that the second definition applies "specifically to the highest and best use of land or site as though vacant."

■ Reaching a conclusion about the highest and best use of the land is, to a limited degree, a matter of conjecture. There are two types of highest and best uses: the highest and best use of the land as vacant and the highest and best use of a property as improved. When examining the highest and best use of the land as vacant, the appraiser should consider the feasible improvements which are necessary upon the land to put it to that use. Patterson acknowledged that in some instances, the appraiser will conclude that the highest and best use is to hold the land as vacant until its price appreciates.

Patterson applied the second definition shown above to determine the highest and best use of this land. He examined the legally permissible uses of the Sharboneau property, concluding that the property was only subject to the restrictions placed upon it by the City. He found that the land was physically best suited for subdivision usage. Patterson also looked at the financially feasible uses of the land and concluded that "considering the location and the existing uses in the neighboring area we believe the tract's primary potential is geared towards a more compatible residential subdivision use." Finally, Patterson coalesced his analysis into a conclusion that the Sharboneau property would be maximally productive when used for single-family residential subdivision usage. By its stipulation, the City apparently concurred in Patterson's conclusion.

Having established the highest and best use of the property, Patterson then undertook to appraise the value of the land when put to that use. He began this process by noting that the "three classic approaches to value," the Cost Approach, the Income Approach, and the Sales Comparison Approach, do not aid in the appraisal of a proposed subdivision. Instead, Patterson acknowledged that the data forming the basis of the appraisal comes from "direct comparisons in the market, indirect comparisons in the market, and the appraiser's judgment, based on the appraiser's experience." Ultimately, Patterson stated, the valuation of a proposed or existing residential subdivision is based on what he termed the "Discounted Sell–Out or Development Method." This method is a hybrid of the three classic appraisal methods and is "applicable to subdivisions or land suitable for subdivision development." Patterson then described the valuation process:

An adequately sized tract or subdivision is valued by estimating the total gross sales of all lots. From the amount deductions are made for all absorption period holding costs such as taxes, insurance, management/security/maintenance, entrepreneurial remuneration and financial holding costs. If the property is undeveloped open land, the cost of construction is also deducted in order to

derive the estimated value of the property as raw land.

Patterson noted that "the most difficult yet most critical conceptual aspect of subdivision valuation concerns the proper appraisal approach to value." He described the division of thought with regard to the market value for a subdivision. Some advocates promote the idea that gross sell-out, which is a summation of retail sales prices, constitutes the subdivision's market value. Others suggest that the use of the discounted value of unit sales, the aggregate wholesale value of the property, is more accurate. Patterson then adopted the notion that both methods are correct, due to what he termed a "double-tiered market phenomenon." He described the phenomenon as the product of different motivations and goals among possible purchasers. On the one hand, end-product users seek to purchase a single lot. In that instance, the value is best described as the retail value of the land. Conversely, so-called "interim purchasers" seek to acquire and develop a sizeable number of lots in anticipation of resale, thus making the wholesale value of the land a more appropriate measure. Patterson concluded that where the property in question is not immediately marketable for sale as single lots, wholesale valuation is appropriate.

The next step in Patterson's methodology entailed a description of the discounted sell-out approach described above. He explained that this method discounts the income streams produced by properties into present worth or value. Therefore, expense or deduction categories must be subtracted from the gross sell-out revenue in order to reach a discounted value. These categories include: general overhead (such as taxes, insurance, advertising, grounds maintenance, unsold-lot real estate taxes, legal and accounting fees, etc.); remuneration for entrepreneurial talent used during the sales period; and construction costs. Such costs are derived from available market data or ascertainable estimates of such market data.

Another factor in assessing the value of the property is the actual present value of the property when put to its highest and best use. Patterson termed this the Combination Rate/Dollar Deduction Method. He stated that this process entails ten steps whose values must be estimated to achieve an aggregate value. Among other things, this process requires the appraiser to estimate the absorption rate, or the duration of original sales, of the subdivided property. He estimated that it would take approximately three years to sell the Sharboneau property, as subdivided.

Patterson next sought to determine the gross sales revenue the lots would provide when sold as single-family residential lots. To make this determination, Patterson examined nearby, recently-sold properties of approximately the same size. First, he looked at a 7,700 square-foot vacant residential lot. This lot was sold for $17,000 in February 1996. Patterson noted that the lot had utilities available, but had no improvements. Next, Patterson examined a second 7,700 square-foot vacant residential lot. This lot was also sold for $17,000 in January 1996. Like the first, this lot was also unimproved and had utilities available. Finally, Patterson looked at an irregularly-shaped 10,683 square-foot vacant residential lot. This unimproved lot was sold for $21,500 in October 1996 and had utilities available. Patterson determined the per square foot value of each of these sales, adjusted for the four percent increase in size of the third lot, and determined the average value of the land to be approximately $2.17 per square foot. Patterson acknowledged that he made certain adjustments to these comparables to bring them into parity with the subject property. He adjusted for the date of sale, location of the property, size, and available utilities. He noted that all three sales were made within competing residential subdivisions in the Harlingen area and were similar in land use and utilities.

Based upon his assumption that the absorption period for the Sharboneau property would be three years and further assuming that the land values would increase by approximately five percent for the second and third years, Patterson estimated the total value of the retail lot sales as $772,727.

Patterson then estimated general overhead, sales expenses, and sales commissions associated with developing and selling the lots. Based on the operating budgets for other comparable projects in the area, Patterson estimated general overhead and sales expenses, including advertising expenses, closing costs, and attorney's fees to be approximately six percent of the gross sell-out price. This is an average amount for such expenses. The expenses for real estate taxes were estimated on a per lot basis. Patterson estimated the total annual taxes for the subdivision lots for each year of the absorption period. He estimated these expenses as $14,483 for the first year, $9,125 for the second, and $3,194 for the third.

Still another estimate used by Patterson was the developer's profit, an item he termed entrepreneurial remuneration. After studying past experiences of local developers, Patterson estimated this value to be twenty-five percent of gross sales. Next, Patterson determined the discount rate, or the financial carrying cost for the debt service and return on equity. Using what he termed the "band of investment or the weighted average" technique, Patterson determined that a discount rate of 0.9050 would apply to the first year, 0.8190 to the second, and 0.7412 to the third.

Applying all of these estimates to the Discounted Sell-Out methodology described above, Patterson applied the following formula to each year of sales:

|  | Retail Revenues |
|---|---|
| (minus) | Commissions |
| (minus) | Overhead and Sales Expense |
| (minus) | Real Estate Taxes |
| (minus) | Entrepreneurial remuneration |
| (equals) | **PROCEEDS** |
| (times) | discount rate |
| (equals) | **NET PROCEEDS** |

He then summed the net proceeds for each of the three years to determine the "overall bulk value" of $413,767, which he rounded to $413,770.

The final step in Patterson's analysis required combination of all his calculations to achieve an estimated value of the raw land. His calculation is reprinted below:

|  | Retail Lot Sales | $772,727 |
|---|---|---|
| (minus) | Net Sales Proceeds | $413,770 |
| (minus) | Development Cost (9.852 ac @12,500/ac) | $123,150 |
| (equals) | **Estimated Value of Raw Land** | $290,620 |

This value was the figure Patterson provided to the court.

The City maintains that Patterson's opinion is unreliable because the subdivision development method of valuation was not shown to reliably predict market value of undeveloped land. We disagree. Patterson's methodology incorporates two of the "classic approaches" to appraisal: the sales comparison approach (to estimate the retail value of lot sales) and the income approach (to estimate the net sales proceeds). The City does not suggest that either of these methods is an invalid approach to valuation. Patterson's use of a hybrid-classical valuation methodology is also valid. Our review of Patterson's report demonstrates that Patterson has used a quantifiable process which gives rise to the conclusion he reached. *See Gammill,* 972 S.W.2d at 727 (finding an expert unreliable where he did not show how his observations supported his conclusion); *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). We cannot say that Patterson's testimony is either unreliable or incompetent. The court did not abuse its discretion in permitting Patterson's testimony. Appellant's first issue is overruled.

## II. Use of Hypothetical Sales to Determine Value of Undeveloped Realty

By its second issue, appellant contends that the trial court erroneously ad-

mitted evidence of hypothetical subdivision sales based on sales of unimproved lots to determine the value of undeveloped realty.

■ Texas courts have adopted a relatively broad definition of fair market value. Specifically, the courts have acknowledged that fair market value is "the price which the property would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought by one who is under no necessity of buying it." *State v. Windham*, 837 S.W.2d 73, 77 (Tex. 1992) (quoting *State v. Carpenter*, 126 Tex. 604, 89 S.W.2d 194, 202 (1936)). The court has permitted this determination to extend beyond the present status of the land, permitting the fact-finder to "consider all of the uses to which the property is reasonably adaptable and for which it is, or in all reasonable probability will become, available within the foreseeable future." *Id.* (quoting *City of Austin v. Cannizzo*, 153 Tex. 324, 267 S.W.2d 808, 815 (1954)). Value may "reflect not only the use to which the property is presently devoted but also that use to which it may readily be converted." *Delhi Gas Pipeline Corp. v. Richards*, 659 S.W.2d 861, 864 (Tex. App.—Tyler 1983, no writ); *see also Cannizzo*, 267 S.W.2d at 814–15. In determining fair market value, the trier of fact may consider the "highest and best use" of the land. *Bauer v. Lavaca–Navidad River Auth.*, 704 S.W.2d 107, 109 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.).

■ Hypothetical plans for nonexistent subdivisions are generally not proper evidence for valuation of condemned land. *Kaufman Northwest, Inc. v. Bi–Stone Fuel Co.*, 529 S.W.2d 281, 288 (Tex.Civ. App.—Tyler 1975, writ ref'd n.r.e.); *Lower Nueces River Water Supply Dist. v. Collins*, 357 S.W.2d 449, 452 (Tex.Civ.App.—San Antonio 1962, writ ref'd n.r.e.). In limiting the use of hypothetical subdivision plans, the courts have been reluctant to permit such plans where the property condemned is "raw acreage." *See Boswell v. Brazos Elec. Power Co-op., Inc.*, 910 S.W.2d 593, 601 (Tex.App.—Fort Worth 1995, writ denied); *Delhi Gas*, 659 S.W.2d at 864; *Collins*, 357 S.W.2d at 452.[1] In particular, these limitations are imposed to curb the likelihood that undeveloped land will be valued as lots, and thus at a higher value. *Collins*, 357 S.W.2d at 452.

■ This limitation is less significant, however, when there is a finding that the highest and best use of the land is for residential subdivision development. Where the court has found that subdivision development is the highest and best use of the land, it would be incongruent to hold that the court cannot consider the value of the land when used for that purpose. *See Cannizzo*, 267 S.W.2d at 815. This is particularly true where the parcel in question is relatively small and the costs of developing the land are relatively easy to accurately ascertain. *See generally Delhi Gas*, 659 S.W.2d at 864 (citing *Calvert v. City of Denton*, 375 S.W.2d 522, 525 (Tex.Civ. App.—Fort Worth 1964, writ ref'd n.r.e.)). Moreover, where there is already some development of the land, such as the creation of easements for roads and sewers and the availability of utilities to the land, the land is no longer raw land.

Several courts have focused on whether a subdivision plat of the land existed prior to the valuation testimony. *See e.g., Texas Elec. Serv. Co. v. Yater*, 494 S.W.2d 271, 275 (Tex.Civ.App.—El Paso 1973, writ ref'd n.r.e.); *City of Corpus Christi v. Po-*

---

1. The supreme court noted in an older opinion, citing numerous other cases, that "even though a tract of land is adaptable to subdivision for commercial and residential lots one seeking to prove the value of such a tract of land may not show what the price of the lots would be if subdivided...." *State v. Willey*, 360 S.W.2d 524, 525 (Tex.1962). However, the cases relied upon in reaching that conclusion all involved taking of small portions of larger tracts. In that instance, the issue of valuation is significantly more complicated than it is here. Where only part of the land is taken, courts must consider not only the value of the land taken, but the effect of the taking on the remaining land. Thus, valuation in that circumstance is more speculative than it is here.

*Iasek,* 404 S.W.2d 826, 831 (Tex.Civ.App.— Corpus Christi 1966, no writ). The lack of a plat in this case is insignificant. The subdivision development plan provided by Patterson describes in some detail the methodology used to hypothetically subdivide the parcel, relying on similar, existing subdivisions. As the San Antonio court acknowledged in a different context, the formality of drawing a plat, while important and necessary, becomes a simple matter of applying a pencil and ruler to a map. *Collins,* 357 S.W.2d at 452. There is sufficient evidence to support the subdivision plan, notwithstanding the failure to develop a plat.

Patterson provided a detailed report in which he accounted for the costs of developing the parcel as a residential subdivision. He used development costs associated with nearby developments as a foundation. Patterson anticipated profits and other expenses in his calculation. He based his calculations on comparable sales in nearby locations. In short, Patterson's report is a reliable estimate of the value of the land put to its highest and best use. We hold that the trial court did not err by admitting Patterson's testimony under these circumstances. The City's second issue is overruled.

### III. Sufficiency of the Evidence

■ The City next contends that, notwithstanding Patterson's testimony, the trial court lacked any evidence to support its finding of a $232,000 assessment. In part, the City's argument centers on its contention that Patterson's opinion testimony is sufficiently scientific to fall within the *Robinson* test. The City claims Patterson's testimony fails that test. As noted above, however, we disagree.

However, the City also contends that Patterson's testimony is unreliable because his methodology is unreliable or flawed. Specifically, appellant argues that Patterson's testimony is unreliable because: (1) he reached the per-square-foot valuation of this property based on sales of other lots in finished subdivisions; and (2) the hypothetical subdivision method circumvents the need to establish a present value of the property.

As noted above, we disagree with the City that Patterson's testimony circumvents the need to establish a present value of the property. Patterson's conclusion represents the value of the property when used for its highest and best purpose. The supreme court has permitted courts to consider the potential uses of property in determining value and Patterson's testimony does nothing more than that.

With regard to valuation, Patterson estimated the value of these lots to be approximately $2.17 per square foot. He based his estimates on sales of other lots in nearby subdivisions. The record reflects that two lots, similar in size to the proposed lots in this hypothetical subdivision, were valued at $2.21 per square foot. On the third comparable, a lot of a slightly larger size, the per-square-foot value was $2.01, a figure which Patterson adjusted to account for the size differential. He then averaged these figures to reach an estimated value for the lots. Appellant argues that Patterson's use of comparable lots in developed areas does not meet the test of similarity articulated by the supreme court. *See State v. Chavers,* 454 S.W.2d 395, 397 (Tex.1970); *Cannizzo,* 267 S.W.2d at 815–16. Those cases are distinguishable from the instant case. In *Chavers,* for example, the landowner sought to prove the value of his property by introducing the price paid for another similarly-sized tract which had a house upon it. The court rejected the claim that the tracts were similar, holding that too many collateral issues would be raised by finding that an improved tract is similar to an unimproved tract. Here, no such problem exists. The lots Patterson analyzed sit in a developed subdivision, but remain undeveloped. Moreover, his methodology accounts for the cost of developing the condemned tract in a manner which is less

291

speculative than the deductions used in *Chavers*. Patterson estimated the costs of development, based on known development costs, and deducted those costs from the gross value of the land when used for its highest and best purpose. We find no similarity problems with this method.

The trial court's assessment is less than Patterson's estimate. There is sufficient evidence to support that finding. The City's third issue is overruled.

## IV. Evidence of Purchase Price

The City complains by its fourth issue that the trial court improperly admitted evidence of the purchase prices for the property. However, the record clearly reflects that the trial court did not rely upon this evidence in reaching its conclusion. Thus, while it may have been error to admit evidence of purchase prices for property bought over ten years prior, *Gomez v. State*, 426 S.W.2d 562, 563 (Tex. 1968), that error was harmless. Tex. R.App. P. 44.1(a). The City's fourth issue is overruled.

Accordingly, the judgment of the trial court is AFFIRMED.