**EXXON PIPELINE COMPANY,**
Appellant,

v.

**Daniel R. ZWAHR, Sandra K. Zwahr, and Union State Bank, East Bernard, Appellees.**

No. 01–99–00283–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 30, 2000.

Rehearing Overruled Jan. 30, 2001.

Joy M. Soloway, Houston, for Appellant.

Richard L. McElya, William D. Noel, Angleton, for Appellee.

Panel consists of Justices COHEN, TAFT, and SMITH.*

## OPINION

JACKSON B. SMITH, Jr., Justice, Assigned.

This is a condemnation case. Exxon Pipeline Company (Exxon) appeals from a judgment that awarded $40,000 to appellees, Daniel and Sandra Zwahr (Zwahrs), representing the fair market value of a 1 .01–acre pipeline easement taken by Exxon and the right to assign the easement. The Zwahrs' suit challenged the decision of the special commissioners, appointed by the trial court, which awarded the Zwahrs

---

\* The Honorable Jackson B. Smith, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

$2,264.90 for Exxon's taking. *See* TEX. PROP.CODE ANN. § 21.018 (Vernon 1984).

In five issues, Exxon contends that the trial court committed reversible error by (1) admitting the testimony of the Zwahrs' expert witness on the value of the land, (2) charging the jury with a question requiring two separate damage findings instead of submitting one broad-form question, (3) improperly instructing the jury on the correct measure of damages, and (4) denying Exxon's post-verdict challenges to the legal and factual sufficiency of the evidence, and excessiveness of the damages.

## FACTS

The Zwahrs purchased a 49–acre tract of land in Fort Bend County in 1989. At that time, the northeast corner of the property was encumbered by a 50–foot wide pipeline easement that contained an underground, 30–inch diameter natural gas pipeline owned by Koch Gateway Pipeline Company (Koch). Although the easement was in place when the Zwahrs purchased the property, they were permitted to grow cotton on the surface of the property.

In 1995, Exxon petitioned the Fort Bend County Court At Law to condemn a 50–foot–wide strip on the Zwahrs' property for an ethane pipeline. The land Exxon condemned has a total surface acreage of 1.01 acre, and overlaps the Koch easement by approximately 82%. The court appointed three special commissioners to hear the case. After the commissioners awarded the Zwahrs $2,264.90, Exxon deposited the full amount in the registry of the court, and took possession of the easement on October 6, 1995. The Zwahrs filed for a de novo trial with the court.

Prior to the de novo trial, Exxon laid its pipeline four feet below the surface parallel to, and approximately 25 feet from, the preexisting Koch pipeline. The Zwahrs were again permitted to plant cotton on the surface of the easement.

The chief issues in the trial de novo were the highest and best use of the 1.01–acre tract and its valuation. After receiving the jury's verdict and overruling Exxon's objections, the court entered judgment in favor of the Zwahrs for $30,000, as the fair market value of the 1.01–acre easement, and $10,000, as the fair market value of Exxon's right to assign the easement.

In its first two issues, Exxon complains that the trial court erred in admitting the opinion testimony of the Zwahrs' appraisal expert because it was unreliable, in that it was contrary to established legal precedent.

## ADMISSIBILITY OF EXPERT TESTIMONY

### A. Standard of Review

■ Whether the trial court properly admitted Kangieser's testimony is a matter within the trial court's discretion and will not be disturbed absent an abuse of such discretion. *See E.I. du Pont de Nemours and Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex.1995). The test for abuse of discretion is whether the court acted without reference to any guiding rules or principles. *Id.* Although the trial court's decision to admit the testimony is one committed to its discretion, it is not for the trial court to decide whether the conclusions reached by the expert are correct; rather, it is to determine whether the analysis used to reach those conclusions is correct. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727–28 (Tex.1998).

### B. Evidentiary Value of Expert Testimony

Unreliable expert testimony is of no evidentiary value. *See Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex.1997). Texas Rule of Evidence 702 requires that all expert testimony, not just scientific evidence, must be relevant and reliable before it is admitted. *Gammill*, 972 S.W.2d at 727.

■ The trial court may exclude the expert testimony if there is too great an analytical gap between the data and the opinion proffered. *Id.* at 727. It should be noted, however, that the trial court's gatekeeping function does not supplant cross-examination as the "traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 728.

■ In determining reliability, the trial court is not to determine the truth or falsity of the expert's opinion, but is to determine whether the expert's opinion is relevant, and whether the methods and research underlying the opinion are reliable. *Robinson,* 923 S.W.2d at 557. If the foundational data underlying opinion testimony is unreliable, an opinion drawn from that data is likewise unreliable. *Havner,* 953 S.W.2d at 714. Even when the underlying data is sound, an expert's testimony is unreliable if the expert draws conclusions from that data based on flawed methodology. *Id.* A flaw in the expert's reasoning from sound data may render reliance on a study unreasonable and render the inferences drawn therefrom dubious. *Id.* Therefore, rather than focus on the expert's conclusions, the trial court should focus on the reliability of the principles, research, and methods underlying them, as well as on the expert's reasoning and methodology. *Robinson,* 923 S.W.2d at 557.

## C. The Experts' Opinions

The Zwahrs and Exxon each presented evidence regarding the "economic unit" of which the condemned property was part, and the highest and best use for that property. *See McAshan v. Delhi Gas Pipeline Corp.,* 739 S.W.2d 130, 131 (Tex. App.—San Antonio 1987, no writ) ("In taking that value, the fact finder should consider the highest and best use to which the land is adaptable."). Exxon's experts opined that the property taken retained its

character as farmland or rural residential land, and was not a separate economic unit. They estimated the market value of the 1.01–acre tract based on a per acre cost of either $1,900 or $1,414, with the total amount due the Zwahrs at either $1,727 or $707.[1] Exxon's experts did not provide a separate value to the right to assign the easement because they were of the opinion that such right was included in the fair market value of the easement and thus could not be separately valued.

The Zwahrs' expert, Brad Kangieser, opined that the 1.01–acre tract, which comprised Exxon's pipeline easement, was a self-contained, separate economic unit, independent from the remainder of the Zwahrs' property. *See City of Tyler v. Brogan,* 437 S.W.2d 609, 613 (Tex.Civ. App.—Tyler 1969, no writ). ("[W]here the tract taken is a self-sufficient economic unit, independent of the remainder of the parent tract, the value thereof should be ascertained by considering such portion alone, and not as a part of the entire tract.").

Kangieser further opined that the highest and best use for the 1.01–acre tract was as a pipeline easement. In support of his opinion, Kangieser testified that such use was (1) physically possible, (2) legally permissible, (3) financially feasible, and (4) maximally productive. *See State v. Tigner,* 827 S.W.2d 611, 613 (Tex.App.—Austin 1992, writ denied) (discussing condemning authority's expert testimony that in appraising property's highest and best use, it must be physically possible, financially feasible, and legally possible for property to be used for that purpose). During voir dire examination, Kangieser stated that the basis for his opinion on highest and best use was the existing Koch pipeline.

Case law dictates that a presumption exists in favor of the existing use of the land. *See McAshan,* 739 S.W.2d at 131.

---

1. Each expert reduced his estimate of value by a percentage allocable to the Zwahrs' retained use of the surface of the land. The first expert used a 10% reduction; the second expert used a 50% reduction.

Here, the existing use for 82% of the 1.01–acre tract at issue was *already* the Koch pipeline easement.

Once Kangieser determined that the highest and best use for the property was pipeline easements, he explained that he then went to the marketplace to find comparable sales. Based on comparable sales of pipeline easements, Kangieser estimated the value of the 1.01–acre easement as follows: $26,398 for the easement, and $9,679 for the right to assign the easement, for a total of $36,077.

## D. Exxon's Challenges

Exxon contends that (1) the trial court abused its discretion in admitting Kangieser's testimony that the highest and best use for the subject property was a pipeline easement because it ignored controlling case law; (2) Kangieser's opinion as to highest and best use was speculative; and (3) Kangieser impermissibly relied on project enhancement, i.e., Exxon's pipeline project, to compute the value of the 1.01 acre easement.

In support of its position, Exxon contends that, *United States v. 8.41 Acres of Land*, 680 F.2d 388 (5th Cir.1982), and *Bauer v. Lavaca–Navidad River Authority*, 704 S.W.2d 107 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.), proscribe the methodology employed by Kangieser under the facts of this case. We disagree.

Unlike the easement in *8.41 Acres of Land*, which the court found could not be severed from the parent tract for purposes of valuation, the condemned land at issue in this case is not an adjacent field, but overlaps 82% of the existing Koch pipeline easement. Moreover, Exxon's pipeline is buried entirely within the existing easement. Unlike the landowner in *8.41 Acres of Land*, it was not necessary for the Zwahrs to take steps to sever the land from the remainder of the property because the land had already been effectively severed by the Koch easement and pipeline. Lastly, the Zwahrs did not need to hope that the tract would be acquired for pipeline purposes as did the landowner in *8.41 Acres of Land*—it already was being used as such. Due to the distinct facts of this case, the holding in *8.41 Acres of Land* is distinguishable and not applicable.

We also do not agree that the analysis found in *Bauer* shows Kangieser's analysis was flawed; rather, if anything, it supports it.[2] The *Bauer* court distinguished *8.41 Acres of Land* by noting that the evidence at trial showed that easement right-of-ways had existed on the Bauer's property since 1958 and that, at the time of the taking at issue, the property contained three pipelines in a well-defined corridor. *Bauer*, 704 S.W.2d at 107, 109. Similarly, in this case, the evidence at trial showed that the Koch easement had existed since 1952, and, at the time of Exxon's taking, a pipeline already existed on the property.[3]

---

**2.** We also note that the Texas Supreme Court has granted petition in a more recent condemnation case, *City of Harlingen v. Estate of Sharboneau*, 1 S.W.3d 282 (Tex.App.—Corpus Christi 1999, pet. granted), which discusses the admissibility of an appraisal expert's testimony relating to the highest and best use of condemned property. In *Sharbonneau*, the land was vacant, although homes had at one time been located on the land, and improvements such as utility connections and road easements remained. The landowner's appraisal expert opined that the highest and best use for the property was as subdivided residential property. The city contended that, regardless of the potential uses for the land, the determination of value is inextricably related to the current status of the property— vacant land. The court found the city's view too limiting and ultimately affirmed the trial court's decision to admit the expert's testimony. While similarities exist between *Sharbonneau* and this case, it is distinguishable from this case in that the current status of the land here is as a pipeline easement, which is the same as the highest and best use determined by Kangieser.

**3.** It should be noted, however, that there may not have been a "well-defined corridor" in this case. Although Kangieser testified that there was not a pipeline corridor on the property until the advent of the Exxon pipeline easement, he stated that the existing Koch easement was a factor in his determination of

Exxon also uses *Bauer* to criticize the Zwahrs for failing to take steps to develop and market easements on the subject property to better define it as separate property, as the landowner in *Bauer* had done. While it may be true that the Zwahrs did not take any affirmative steps to sell and develop easements, evidence introduced at trial casts some doubt on the importance and relevance of this factor.

Kangieser testified that it is not possible to market pipeline easements because the taking of a pipeline easement depends on whether a demand exists on the subject property. If a pipeline does not exist leading to and from his property, it would be futile for a property owner to spend time and money promoting a pipeline. The placement of a pipeline also depends on other factors not within the landowner's control such as population density.

In addition, Exxon's project engineer, Wayne Wichnewsky, who managed the construction of the Exxon pipeline, testified that, in deciding where to place pipelines, Exxon prefers to lay new lines next to existing ones. He testified that Exxon chose to follow the existing Koch pipeline which made the Zwahrs' property attractive to Exxon.[4] Thus, it was not the Zwahrs' actions or inactions that determined the placement of the Exxon pipeline easement; rather, it was the existing Koch pipeline.

Exxon further contends that the highest and best use for the subject property cannot be a pipeline easement because the Zwahrs did nothing to segregate the condemned portion of the property for use as a pipeline easement. Instead, they continued to grow cotton on all of their land. Regardless of whether the surface of the easement has cotton growing on it or not, the land has been a pipeline easement for over 40 years, and will continue to be used for pipeline easements.

Based on the record, we find that *8.41 Acres of Land* and *Bauer* do not proscribe Kangieser's methodology or reasoning.

■ Exxon also contends that Kangieser's opinion has no probative force because it is based on speculation. We first note that it is a recognized principle that real estate appraisal is not an exact science and requires the exercise of personal judgment. *See Parallax Corporation, N.V. v. City of El Paso*, 910 S.W.2d 86, 89 (Tex. App.—El Paso 1995, writ denied) (discussing testimony of Charles Osenbaugh, past president of Society Real Estate Appraisers, and David Craig, past president of American Institute of Real Estate Appraisers, that real estate appraisal is not an exact science and requires personal judgment).

Although Kangieser testified that it was speculative whether a second pipeline would be buried on the land, he also testified that the existence of the first pipeline on the property created the probability that a pipeline would be placed on the condemned property rather than on another strip of land where there was no pipeline. This latter statement is supported by Exxon's own project engineer's testimony, as stated above.

While expert testimony that is based upon possibility, speculation, and surmise, rather than a reliable scientific basis, is "no evidence," *Havner*, 953 S.W.2d at 712, Kangieser's testimony as to the highest and best use for the condemned land does not fit this description. The evidence in this case shows that an easement had existed on 82% of the land since 1952 when the Koch easement was established.

■ Exxon further contends that Kangieser's valuation of the 1.01 acre tract was

the highest and best use of the condemned land.

**4.** It seems disingenuous that, on the one hand, Exxon admits that the reason it chose the property was because it was already being used as a pipeline easement, but then, attempts to discount the importance of this fact.

improperly predicated on "project enhancement," that is, the Exxon pipeline project. Generally, the market value of condemned property is determined as of the date of the taking of the property. *Fuller v. State*, 461 S.W.2d 595, 598 (Tex. 1970). The landowner is not entitled to recover for any enhancement in the value of his property caused by the public improvement at issue. *Id.*

It is uncontested that the 1.01–acre tract was already encumbered, at least in part, by the Koch pipeline easement at the time of Exxon's condemnation. Kangieser's testimony, developed in voir dire examination, was that he based his opinion for highest and best use of the property on the existing Koch easement. On cross-examination at trial, he confirmed his opinion that the 1.01–acre tract was worth $36,077 *before* the advent of the Exxon pipeline easement.

Although Kangieser testified during cross-examination that the 1.01–acre tract comprised a separate economic unit that did not exist until the Exxon pipeline condemnation, he clarified this statement by observing that the condemnation merely defined the parameters of the economic unit and that the Koch easement provided the basis for the highest and best use of the property.

The Texas Supreme Court stated in a condemnation action involving a partial taking:

> If [the landowner] is permitted to present evidence of the market value of the part taken utilizing a larger tract than that sought by the condemning agency based on its theory of the highest and best use of the property, then the State should be allowed to present evidence on its competing theory of the highest and best use of the property. *It is then for the jury to decide which evidence to accept and which to reject in deciding the ultimate issue of market value.*

*State v. Windham*, 837 S.W.2d 73, 77 (Tex. 1992) (emphasis added).

We hold that the trial court did not abuse its discretion in admitting Kangieser's testimony.

We overrule appellant's issues one and two.

## CHARGE ERROR

In issues three and four, Exxon contends that the trial court committed reversible error by (1) requesting the jury to make two separate findings regarding the value of the condemned 1.01–acre easement, instead of submitting one broad-form question, and (2) refusing Exxon's instructions relating to the correct measure of damages.

### A. Separate Damage Finding for Right to Assign Easement

The trial court submitted the following question to the jury regarding the value of the property taken:

### QUESTION NO. 1

In answering Question No. 1 consider the elements listed below and none other. Consider each element separately. Do not include any consideration for one element in any other element.

Element a. What was the fair market value on October 6, 1995, of the Easement covering 1.01 acres of [the Zwahrs'] land?

**Answer in dollars and cents**
**ANSWER:** $30,000.00

Element b. What was the fair market value, if any, on [the date of taking], of the right to assign the Easement covering 1.01 acres of [the Zwahrs'] land?

**Answer in dollars and cents**
**ANSWER:** $10,000.00

(Emphasis in original).

Exxon contends that by requiring the jury to make two separate damage findings, the trial court (1) failed to follow the mandate of the Texas Supreme Court to submit one, broad-form question on fair market value of the property, (2) invited

the jury to award excess damages, and (3) improperly commented on the weight of the evidence.

## B. Broad–Form Submission Required

In *Westgate, Ltd. v. State*, 843 S.W.2d 448, 456 (Tex.1992), the supreme court directed trial courts to conform damage questions in condemnation cases to the broad-form submission required by Texas Rule of Civil Procedure 277. *Id.* The *Westgate* court noted that two jury questions should be submitted in such cases to determine (1) the market value of the land taken, considered as severed land, and (2) damages to the remainder, accompanied by an instruction that such damages should be determined by considering the difference between the remainder's pre- and post-taking value. *Id.* In this case, however, because the Zwahrs waived their claim to compensation on the remainder property, the only issue in dispute was the value of the property taken. Thus, no question on the value of the remainder was required or submitted.

In the charge, the trial court instructed the jury that Exxon acquired the right to assign the easement. The charge stated that "right to assign" means that the easement could be transferred, sold, or conveyed to another common carrier to operate the pipeline as a common carrier. The charge also listed numerous other rights and limitations associated with the easement.

While Exxon acquired the right to assign the easement, the Zwahrs cite no authority that allows an additional damages finding on this element. Applying the mandate of *Westgate*, we hold that the trial court erred in submitting a separate damage question on the fair market value of the right to assign the easement, and should have submitted a single, broad-form question on the fair market value of the property taken by Exxon. *Id.*

The failure of a trial court to submit questions in broad-form will not always be reversible error. *Id.* at 758 (citing *H.E.*

*Butt Grocery Co. v. Warner*, 845 S.W.2d 258, 260 (Tex.1992)). We believe that the error of the trial court in submitting two issues instead of a broad-form issue was harmful to Exxon. It is manifest that the court's award of $40,000 to the Zwahrs was based on the jury's finding of $30,000 for the fair market value of the easement on the date of the taking, plus the jury's finding of $10,000 for the fair market value of the right to assign the easement on the date of the taking. The harm to Exxon was the additional $10,000 included in the court's judgment.

We have authority to modify a trial court's judgment to correct the trial court's error. TEX.R.APP. P. 43.2(b). Thus, judgment for the fair market value of the 1.01.-acre pipeline easement taken by Exxon is reduced by the amount of $10,000. Exxon's issue three is sustained to the extent that the amount of actual damages is reduced to $30,000, representing the fair market value of the easement.

## C. Instruction on Measure of Damages: "Before" and "After" Value

In issue four, Exxon contends that the trial court committed reversible error by refusing to include two instructions on damages in the jury charge. The first of these instructions is:

### *Instruction*

You are instructed that the fair market value of the Easement is the difference between the fair market value of the 1.01 acre strip of land, immediately before being covered by the Easement on [the date of taking], and the fair market value of the 1.01 acre strip of land, immediately after being covered by the Easement on [the date of taking].

An appellate court reviews a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard. *Texas Dept. of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990). The trial court thus has wide

latitude to determine the propriety of explanatory instructions and definitions. *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 791 (Tex.1995). However, a trial court must submit explanatory instructions and definitions that will assist the jury in rendering a verdict. *Wichita County, Texas v. Hart*, 917 S.W.2d 779, 783–84 (Tex.1996). If error is shown, the appellate court can reverse only if the error is shown to be harmful. Tex.R.App. P. 44.1(a); *Winfield v. Renfro*, 821 S.W.2d 640, 644 (Tex.App.—Houston [1st Dist.] 1991, writ denied).

 This case presents what has been referred to as a "double partial-taking case" because Exxon acquired only a limited property interest in a portion of the Zwahrs' property. *McClain v. Elm Creek Watershed Authority*, 925 S.W.2d 756, 759 (Tex.App.—Austin 1996, no writ). When the condemnor takes only an easement in the property, as in this case, the landowner is entitled to compensation in the amount of the difference in market value of the part taken free of the easement, and its market value burdened by the easement. *Id.* In such a case, the jury determines the proper measure of damages by determining the market value of land burdened by the easement, considered as severed land, before the taking, minus the value of the same tract, considered as severed land, after the taking. *Id.* This calculation results in damages representing the fair market value of the easement on the date of the taking.

In this case, the trial court submitted a question that directly asked the jury to determine the fair market value of the easement. In support of the question, the trial court instructed the jury as to the definition of "fair market value." [5]

At trial, each of the party's experts gave his respective opinion as to the fair market value of the easement, as severed land. Each of the experts testified regarding the fair market value of the 1.01–acre tract before the taking, and immediately after the taking, to determine the value of Exxon's easement rights.

In the opinion of Exxon's expert, Albert Allen, the Zwahrs' entire 49–acre tract had a market value of $1,900 an acre. He opined that Exxon had acquired 90% of the fee value of the 1.01–acre tract, leaving the Zwahrs with 10% of the fee value. Allen concluded that the value of the easement, as severed land, was $1,727.

Exxon's other expert, David Dominy, testified that he determined the fair market value of the 1.01–acre tract of land immediately before Exxon's acquisition by considering it not as severed land, but as part of the overall 49–acre tract. Basing his calculation on $1,400 per acre, Dominy determined that the fair market value of the 1.01–acre tract immediately before the taking was $1,414. Dominy further opined that the fair market value of the easement immediately after the taking was $707, representing 50% of the fee value of the property. Allen's and Dominy's valuations apparently placed no significance on the fact that the Koch easement was already in place.

Kangieser testified that the value of the 1.01–acre tract before Exxon's taking was $36,077. He stated that, after the taking, the tract was worth nothing because the entire value of the property was taken by Exxon.

As shown by the experts' testimony, the evidence presented to the jury regarding the value of the easement and the damages due to the Zwahrs was based on the before and after valuation methodology described

---

5. The trial court defined "fair market value" as "the price which the property would bring when offered for sale by a knowledgeable person who desired to sell, but is not obligated to sell, and bought by a knowledgeable person who desires to buy, but is under no necessity to buy, taking into consideration all of the uses to which it is reasonably adaptable and for which it either is or in all probability will be available within the reasonable foreseeable future." *City of Austin v. Cannizzo*, 153 Tex. 324, 267 S.W.2d 808, 815 (1954).

in Exxon's requested instruction. Thus, the calculation of damages using the before and after methodology was already done for the jury by the experts. No additional instruction was necessary for the jury to consider in giving effect to this evidence.

We hold that the trial court did not abuse its discretion in refusing to submit Exxon's instruction on before and after valuation.

**D. Instruction on Project Enhancement**

■ The other instruction submitted by Exxon, which the trial court refused, relates to project enhancement and reads:

*Instruction*

You are further instructed that in determining the fair market value of the 1.01 acre strip of land, immediately before being covered by the Easement on [the date of taking], you are not to consider the effect, if any, of the Exxon Pipeline Company project.

■ When the trial court refuses to submit a requested instruction or definition, our review is focused on whether the request was reasonably necessary to enable the jury to render a proper verdict. *See* TEX.R. CIV. P. 277; *Vinson & Elkins v. Moran,* 946 S.W.2d 381, 405 (Tex.App.—Houston [14th Dist.] 1997, writ dism'd by agr.). We note that the trial court's charge need not, and should not, burden the jury with surplus instructions. *See Acord v. General Motors Corp.,* 669 S.W.2d 111, 116 (Tex.1984). Moreover, every correct statement of the law does not belong in the jury charge. *Maddox v. Denka Chemical Corp.,* 930 S.W.2d 668, 671 (Tex.App.—Houston [1st Dist.] 1996, no writ).

While the refused instruction may be a correct statement of the law, it was not reasonably necessary to enable the jury to reach a proper verdict because the question submitted was clear and unambiguous: "What was the fair market value, if any, on October 6, 1995 of the easement covering 1.01 acres of [the Zwahrs'] land?" We hold that the trial court did not abuse its discretion in refusing to submit this instruction.

We overrule appellant's issue four.

**SUFFICIENCY OF EVIDENCE AND EXCESSIVE VERDICT**

As a corollary to issues one and two, Exxon contends, in issue five, that Kangieser's opinion testimony is legally and factually insufficient to support the jury's verdict because it was erroneously admitted. Exxon also raises a factual sufficiency challenge in issue five, on the basis that the jury's verdict was in excess of any evidence introduced at trial, including Kangieser's testimony.

■ In determining a "no evidence" or legal sufficiency point, we must consider all record evidence in the light most favorable to party in whose favor verdict was rendered, and every reasonable inference deducible from the evidence is to be indulged in that party's favor. *Havner,* 953 S.W.2d at 711. In conducting a factual sufficiency review, we must consider and weigh all evidence, both supporting and conflicting, and may set aside a finding only if it is so contrary to overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

■ As previously stated, Kangieser opined that the fair market value of the 1.01 acre easement was $26,398, or approximately 60 cents per square foot. The jury's verdict of $30,000 for the fair market value of the easement is slightly in excess of 68 cents per square foot.[6]

6. As previously discussed, Kangieser determined that the value of the right to assign the easement was $9,679, and the jury awarded the Zwahrs $10,000 for the right to assign the easement. The appropriateness of the jury's award of $10,000 for the fair market value of

In support of its argument, Exxon cites to *Callejo v. Brazos Electric Power Cooperative, Inc.*, 755 S.W.2d 73 (Tex.1988), which involved the determination of the diminution in value of property following partial condemnation in which the only evidence of value was expert testimony. In *Callejo*, the supreme court stated that, although a jury is not bound as a matter of law to accept expert witnesses' testimony, it may not "leap entirely outside of the evidence in answering any question submitted to them." *Id.* at 75. However, where there is evidence other than expert testimony on which the jury could compute value, the jury is not bound by expert testimony. *Parallax*, 910 S.W.2d at 86.

As stated above, the rendition of a real estate appraisal is not an exact science and is subject to the exercise of judgment. We note that while the *Callejo* court cited to the absence of value other than bare expert testimony, such is not the record in this case. The jury here was presented with evidence, in addition to Kangieser's testimony, upon which it could evaluate the easement's fair market value. The jury had the opportunity to hear and compare the testimony of Dominy and Allen with that of Kangieser.

Kangieser testified that he predicated his opinion on six comparable sales of exclusive easements, which ranged in price from 51 cents per square foot to $22.41 per square foot.[7] The jury was presented with evidence that contained detailed information regarding these comparables, including the total sales price, price per square foot and per rod, locations, and dates of the sales. From this evidence, the jury could compute the fair market value of the easement to be $30,000.

Based on the record, the jury's verdict regarding the fair market value of the easement is within the range of the evidence presented and is not a significant departure from Kangieser's testimony. *See Parallax*, 910 S.W.2d at 92–93 (holding that in condemnation case, sufficient evidence existed to support jury's finding of damages, which was below range of damages given by experts, because other evidence, including comparables used by landowner's expert, were presented to jury, on which it could compute value).

Having determined that the trial court did not abuse its discretion in admitting Kangieser's testimony and applying the usual standards of review, we hold that legally and factually sufficient evidence supports the jury's verdict regarding the fair market value of the easement.

We overrule appellant's issue five.

Accordingly, the judgment of the trial court is modified to reduce the award for the fair market value of the 1.01–acre easement taken by Exxon to $30,000. In all other respects the judgment of the trial court is affirmed, with the exception that the cause is remanded to the trial court to recalculate proper interest and enter judgment in accordance with this opinion.

Justice TAFT dissenting.

TIM TAFT, Justice, dissenting.

I respectfully dissent. I would conclude that the Zwahrs' expert used flawed methodology and impermissibly considered the enhancement resulting from Exxon's taking. Accordingly, I would conclude that his testimony was inadmissible, that it was therefore "no evidence," that the trial court committed reversible error by permitting the expert to testify, and that we must reverse the judgment of the trial court without addressing Exxon's charge-error complaints. This disposition would ordinarily require rendition of a take-nothing judgment in Exxon's favor. But because Exxon stipulated, in oral argument, its willingness to pay the Zwahrs the

---

the right to assign the easement is discussed *supra* under issue three.

7. The explanation for the variance in the prices per square foot is related to the varying widths of the exclusive easements used as comparable sales.

amount awarded by the Fort Bend County Commissioners, I would reverse the judgment of the trial court, with instructions to render judgment for that amount.

### Facts and Procedural History

The Zwahrs purchased a 49–acre tract of land in Fort Bend County in 1989. They paid $900 an acre, for a total of $44,408.43, and used the land for cotton farming. Since 1952, an underground pipeline easement had been in place across the northeast corner of the land. United Gas Pipeline Company was the first owner of the easement, and transferred it to Koch Gateway Pipeline Company in 1993. The pipe in the United/Koch easement is 30 inches in diameter, lies completely below ground level, and does not affect cotton farming on the surface.

In 1995, Exxon petitioned the Fort Bend County commissioners to condemn a 50–foot–wide strip on the Zwahrs' property for an ethane pipeline. The strip of land Exxon condemned lies within the existing United/Koch easement and has a total surface acreage of 1.01 acre. After the Fort Bend County Commissioners set the compensation due the Zwahrs for Exxon's taking at $2,264.90,[1] Exxon deposited the full amount of the award in the registry of the court, and took possession of the easement on October 6, 1995.

Exxon laid the pipeline early in 1996, as part of an eight and ⅝ inch diameter, ethane-carrying line that begins in Katy, Texas, and continues to Damon, Texas. On the Zwahrs' property, the line is four feet below the surface, and is approximately 25 feet away from the existing United/Koch pipeline, which it parallels. The 1.01 acre condemned by Exxon overlaps the United/Koch easement by at least 80%. As with the United/Koch easement, the pipe-line had no effect on the Zwahrs' continued use of the surface to farm cotton.

The trial de novo in this case followed summary judgments confirming Exxon's right to condemn. Under the live pleadings at trial, Exxon effectively modified its taking from 50 to just under 20 feet by authorizing other pipelines within its easement, provided that any pipe laid be placed at least 10 feet away from Exxon's. The chief controversy during trial concerned the "highest and best use" of the 1.01 acre Exxon condemned. For Exxon's experts, the land retained its character as farmland or rural residential land, and was not a "separate economic unit." The Zwahrs' expert maintained the 1.01 acre was a "separate economic unit," whose highest and best use was as a pipeline easement, with a value independent from that of the surface acreage.

Exxon presented two experts who estimated the market value of the 1.01 acre taken based on a per acre cost of either $1,900 or $1,414, with the total amount due the Zwahrs either $1,727 or $707.[2] The Zwahrs' expert, Brad Kangieser, estimated the value of the actual 1.01 acre taken as follows: $26,398 for the easement itself and $9,679 for the right to assign the easement, for a total of $36,077. As the record reflects, however, even after Exxon took possession of the easement, Daniel Zwahr placed much the same value on the land as Exxon. In a bank-credit statement, and also in divorce papers, Zwahr stated the entire 40–acre tract was worth $50,000, or roughly $1,000 per acre—just $100 per acre more than the purchase price.

Over Exxon's objections to the court's charge, the jury awarded the Zwahrs $30,000 as the fair market value of the 1.01–acre easement and $10,000 as the fair market value of Exxon's right to assign

---

1. The commissioners' award recognizes the Zwahrs' lienholder, the Union State Bank, East Bernard.

2. Each expert reduced his estimate of value by a percentage allocable to the Zwahrs' retained use of the surface of the land. The first expert used a 10% reduction; the second expert used a 50% reduction.

the easement. The only testimony that tends to support this verdict is Kangieser's, although the actual amount the jury awarded exceeds Kangieser's valuation. The trial court entered judgment on the verdict, after deducting the $2,264.90 Exxon had deposited into the registry of the court for the commissioners' award, and overruled Exxon's postverdict challenges to the legal and factual sufficiency of the evidence.

## Admissibility of Kangieser's Opinion Testimony

Exxon's first two issues challenge the admissibility of Kangieser's testimony concerning the value of the land. Exxon reurges the inadmissibility of Kangieser's testimony in a portion of its fifth issue, which challenges the legal sufficiency of the evidence to support the verdict.

### A. Admissibility vs. Sufficiency

Exxon contends Kangieser's evaluation of the land was inadmissible and thus "no evidence" because: (1) he deviated from established legal precedent and acceptable methodology, and admittedly speculated in formulating his opinion of value; and (2) his evaluation is impermissibly premised on the land as a separate economic unit and on enhancement of the land due to Exxon's taking.

Exxon relies on recent decisions that impose standards of reliability as a prerequisite to admissibility for expert testimony under rule 702. TEX.R. EVID. 702; *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 721–28 (Tex.1998); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711–14 (Tex.1997); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993);

*E.I. duPont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex.1995). Exxon also contends that established case law precludes Kangieser's method of appraising the land. *See United States v. 8.41 Acres of Land*, 680 F.2d 388 (5th Cir.1982); *Bauer v. Lavaca–Navidad River Auth.*, 704 S.W.2d 107 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.).

*Havner* authorizes parties to challenge scientific opinion testimony on the grounds that it is unreliable, and therefore "no evidence." *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex.1998) (citing *Havner*, 953 S.W.2d at 706). A "no evidence" challenge will be sustained: (1) when there is a complete absence of evidence of a vital fact; (2) when rules of law or evidence preclude according weight to the only evidence offered to prove a vital fact; (3) when the evidence offered to prove a vital fact is no more than a scintilla; or (4) when the evidence conclusively establishes the opposite of the vital fact. *Havner*, 953 S.W.2d at 711.

Exxon's challenge to Kangieser's testimony relies on the second "no evidence" category. By challenging the reliability of Kangieser's testimony, and therefore, its admissibility, Exxon contends the testimony is "no evidence" because a "a rule of law or evidence," specifically rule 702, precludes giving the evidence any weight. *See Maritime Overseas*, 971 S.W.2d at 409; *Havner*, 953 S.W.2d at 711, 713. Accordingly, we begin our analysis of Exxon's "no evidence" arguments by examining the reliability, and, therefore, the admissibility, of Kangieser's testimony. *See General Motors Corp. v. Sanchez*, 997 S.W.2d 584, 590 (Tex.1999); *Maritime Overseas*, 971 S.W.2d at 410–11.[3]

---

**3.** A party who challenges the reliability, and thus, the admissibility, of expert testimony must preserve error by objecting before trial, or when the evidence is offered at trial, and may not rely on a later motion to strike or a postverdict challenge to the legal sufficiency of the evidence. *Maritime Overseas*, 971 S.W.2d at 409. A timely objection allows the

trial court to perform its gatekeeper role, and provides the proponent of the evidence an opportunity to cure any defect that may exist, thus preventing trial by ambush. *Id.* Exxon objected to Kangieser's testimony even before trial began, by a motion in limine urging the trial court to strike the testimony in its entirety, and reurged its objections during trial by

## B. Admissibility of Kangieser's Expert Testimony

### 1. Pre-*Daubert* Challenges to Methodology

Texas courts have long rejected market-value appraisals based on improper methodology. *E.g., State v. Walker*, 441 S.W.2d 168 (Tex.1969) (vacating condemnation award premised on evidence of market value of facility on land adjacent to condemned land, but not damaged by the taking, and cost of razing and rebuilding that facility on the adjacent land); *Texas Fruit Palace, Inc. v. City of Palestine*, 842 S.W.2d 319, 323 (Tex.App.—Tyler 1992, writ denied) (holding that trial court properly rejected testimony of appraiser who conceded other appraisers did not use his method of evaluation); *McAshan v. Delhi Gas Pipeline Corp.*, 739 S.W.2d 130, 131 (Tex.App.—San Antonio 1987, no writ) (holding that trial court properly excluded evidence of leases of compressor sites when highest and best use of condemned land was as pastureland).

### 2. Rule 702 and *Daubert* Challenges to Methodology

A witness may offer opinion testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact," and if the witness is "qualified as an expert by knowledge, skill, experience, training, or education." Tex.R. Evid. 702. To be admissible, an expert must be qualified, and his opinion must be relevant and have a reliable basis. *Gammill*, 972 S.W.2d at 726; *Robinson*, 923 S.W.2d at 556–57; *see City of Harlingen v. Estate of Sharboneau*, 1 S.W.3d 282, 284–85 (Tex.App.—Corpus Christi 1999, pet. granted).[4] The burden

to establish reliability is on the proponent of the evidence. *Gammill*, 972 S.W.2d at 718–19. While the trial court's broad discretion to determine admissibility will be reversed only if abused, *e.g., Robinson*, 923 S.W.2d at 558, it is the primary responsibility of the trial court to serve as "evidentiary gatekeeper" by screening out unreliable expert evidence. *Sanchez*, 997 S.W.2d at 590; *Robinson*, 923 S.W.2d at 556 (adopting *Daubert* criteria).

Among the non-exclusive factors that may be considered in determining the reliability of the basis of the expert's opinion are:

(1) whether the theory can be and has been tested;

(2) whether the theory has been subjected to peer review;

(3) the potential rate of error of the theory; and

(4) the general acceptance of the theory in the relevant community.

*Sanchez*, 997 S.W.2d at 590; *see Gammill*, 972 S.W.2d at 720; *Robinson*, 923 S.W.2d at 557.[5] The trial court's discretion extends to determining which of the *Daubert* factors reasonably measures whether an expert's opinion is reliable, and whether other factors might apply. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1174–75, 1176, 143 L.Ed.2d 238 (1999). The most relevant factor here is the fourth, whether Kangieser's method of appraising condemned land was generally accepted in Texas.

Moreover, the trial court's rule 702 gatekeeping function applies as well to technical, "skill- or experience-based" methodology or observation, and other specialized

---

4. conducting a voir dire of Kangieser, concerning the basis of his testimony, by moving to strike the testimony as impermissibly premised on product enhancement, and by objecting to the Zwahrs' demonstrative evidence on the same basis. Exxon also objected that the Zwahrs' cross-examination of Exxon's expert was impermissibly premised on product enhancement. These timely objections preserved Exxon's *Daubert/Robinson/Havner* challenge.

4. Argued September 13, 2000.

5. *Gammill* and *Robinson* list two additional, non-exclusive factors: the non-judicial uses made of the theory or technique, and the extent to which the technique relies on the subjective interpretation of the expert. *Gammill*, 972 S.W.2d at 720; *Robinson*, 923 S.W.2d at 557.

knowledge, and not merely to the application of scientific principles. *See Kumho Tire*, 119 S.Ct. at 1176 (tire failure analyst). The *Daubert* criteria thus supplant the well-settled standards that have long determined the reliability, and, therefore, the admissibility, of expert evaluations in a Texas condemnation case.

## C. Market Value

The Texas Constitution guarantees adequate compensation to landowners whose property is condemned. TEX. CONST. art. I, § 17. Adequate compensation means just compensation, and implies fair market value of the property. *City of Houston v. Religious of the Sacred Heart*, 811 S.W.2d 734, 736 (Tex.App.—Houston [1st Dist.] 1991), *aff'd*, 836 S.W.2d 606 (Tex.1992). Market value is the price that a buyer, who wishes, but is not obligated, to buy, would pay a seller who wishes, but is not obligated, to sell. *Taub v. City of Deer Park*, 882 S.W.2d 824, 827 (Tex.1994); *Walker*, 441 S.W.2d at 170 & n. 1; *Bauer*, 704 S.W.2d at 110.

### 1. Time of Taking—"Before and After," but not "Enhancement"

The market value of the land taken for a pipeline easement is determined as of the time of taking. *Heddin v. Delhi Gas Pipeline Co.*, 522 S.W.2d 886, 888 (Tex.1975). When, as here, only a portion of the land is taken for an easement, a "partial taking" occurs. In a partial taking case, market value is measured by the difference between the market value of the land actually condemned and the difference, if any, in the market value of the remaining land immediately before and after the taking. *Taub*, 882 S.W.2d at 827; *Bauer*, 704 S.W.2d at 109; *8.41 Acres of Land*, 680 F.2d at 391–92 & n. 5.

Except in narrow circumstances that do not apply here, it is settled law that market value may not consider "project enhancement," i.e., any change in the value of the remaining land that results from the taking. *Fuller v. State*, 461 S.W.2d 595, 598 (Tex.1970); *State v. Carpenter*, 126

Tex. 604, 89 S.W.2d 194, 201 (1936); *McAshan*, 739 S.W.2d at 131; *see Religious of the Sacred Heart*, 811 S.W.2d at 737; (rejecting consideration of the project that initiated the condemnation as either increasing or diminishing market value of the remainder).

### 2. Existing Use Presumed Highest and Best Use

Market value considers the highest and best use to which the land is adaptable. *Bauer*, 704 S.W.2d at 109; *McAshan*, 739 S.W.2d at 131. The existing use of the land, in this case, cotton farming, is its presumed highest and best use. *McAshan*, 739 S.W.2d at 131; *8.41 Acres of Land*, 680 F.2d at 394. The presumption is rebuttable on the landowner's showing a reasonable probability, as of the time of taking, that the property was adaptable and needed, or would likely be needed in the near future, for the potential use. *McAshan*, 739 S.W.2d at 131; *8.41 Acres of Land*, 680 F.2d at 394–95. Here, the use proposed by the Zwahrs' expert, Kangieser, was a pipeline easement.

### D. Effective Severance—Highest and Best Use as Pipeline Easement

Texas has long permitted landowners to show that land condemned as an easement has been effectively severed from the remaining, parent tract, and therefore has a different value from the remainder. *See Bauer*, 704 S.W.2d at 109; *8.41 Acres of Land*, 680 F.2d at 392 n. 5 (noting Texas law). When a severance occurs, the land is evaluated as a separate economic unit, without reference to the remainder, in which case the "before and after" method, which considers the remainder, does not apply. *See Bauer*, 704 S.W.2d at 109.

Exxon contends that, unless certain conditions exist, in a partial taking case, a market-value appraisal may not consider a pipeline easement as the highest and best use of the land taken, as Kangieser did here. Exxon maintains the necessary conditions do not exist here, that this is

therefore a partial-takings case, and that Kangieser's methodology is flawed and therefore inadmissible because he evaluated the Zwahrs' land as a separate economic unit. I agree.

### 1. No Severance as Pipeline—*8.41 Acres of Land*

In *8.41 Acres of Land*, the United States Department of Energy condemned land, owned by two corporations, for use as a pipeline. 680 F.2d at 390. Much of the surface area was leased for grazing, but there was a factory on the land of one of the corporations, and several large chemical companies had plants in the same area. 680 F.2d at 390, 393. The government's expert maintained the highest and best use for both tracts was as industrial plant sites, worth $3,500 per acre. 680 F.2d at 391.

As here, the corporations' experts maintained the highest and best use of the land was as a pipeline easement, worth from $16,000 to $19,000 per acre. *Id.* By valuing the condemned land differently from the parent tracts, the corporations' experts effectively severed the condemned land from the original tracts. *Id.* at 392–393.[6] Kangieser used the same methodology here in evaluating the 1.01–acre strip as a "separate economic unit."

The United States Court of Appeals for the Fifth Circuit rejected this method of evaluation because the land taken, like the parent tract, was used as pastureland, and was thus identical to, and integrated with, the parent tract. *8.41 Acres of Land*, 680 F.2d at 393. Effective severance of the condemned tracts never occurred because there was no evidence of actual steps taken to sever the tracts. *Id.* at 394. Mere speculation about their "potential" use as pipeline easement, much less the landowners' hope that would happen, were not sufficient to effectively sever the tracts. *Id.* at 393–94. Accordingly, there was no basis for evaluating the tracts as pipeline

rather than as pastureland or industrial land. *Id.* at 394. Because the corporations could not show a reasonable possibility that the land was adaptable and needed in the future for pipeline, they did not overcome the presumption that the existing use was the highest and best. *See id.* at 394–95.

### 2. Severance as Pipeline: *Bauer*

The landowner's evidence was sufficient to overcome the presumption in *Bauer*, however, in which the river authority maintained it condemned pastureland, as in *8.41 Acres of Land*, and not pipeline easement. *See Bauer*, 704 S.W.2d at 109. Distinguishing *8.41 Acres of Land*, the Corpus Christi Court of Appeals concluded the trial court had erroneously excluded evidence that an easement corridor was the highest and best use of the land. *Bauer*, 704 S.W.2d at 108. While there were no established pipeline corridors in *8.41 Acres of Land*, three were in place on Bauer's land. *Bauer*, 704 S.W.2d at 109–10. Bauer, a career-professional with 35 years' experience in purchasing and laying rights-of-way, had personally negotiated the sales of these pipelines, and was actively developing his land to maximize its use as pipeline easement by planning to add to the existing pipelines. *Id.* at 108–09, 111. In the opinion of Bauer's real estate appraiser, a pipeline corridor already existed on the land the river authority condemned; even the authority's appraiser evaluated the land as an easement corridor, effectively severed from the remaining pastureland. *Id.* at 109. Because an effective severance had occurred, there was no basis to exclude expert testimony on the value of the land as easement corridor. *Id.* at 109–10. Bauer's evidence of comparable sales of pipeline easements in the well-defined and established corridor was likewise erroneously excluded. *Id.* at 111–13.

---

6. Because severance implies a total taking, the corporations' experts did not use the "be-

fore and after" method, which controls partial taking cases. 680 F.2d at 394.

## E. Implications for Kangieser's Testimony

### 1. No "Separate Economic Unit" Here

The considerations supporting effective severance as a "separate economic unit" in *Bauer* are not present here. Despite the United/Koch easement in place since 1952, there is no evidence of any steps taken to develop the land as pipeline easement, and thus warrant considering the land as severed from the Zwahrs' remaining 49 acres. The evidence shows just the opposite: The Zwahrs farmed cotton on the land and used it for that purpose only. Moreover, Daniel Zwahr's own estimates of the value of the entire tract, even after Exxon's taking, are consistent with that single, unified use. Accordingly, as in *8.41 Acres of Land,* no circumstances supported Kangieser's opinion that the land constituted a separate economic unit, used as a pipeline easement, that had been effectively severed from the remainder of the tract, used as farmland. As in *8.41 Acres of Land,* Kangieser's reliance on the "separate economic unit" method of evaluation was therefore misplaced.

### 2. Improper Reliance on Project Enhancement

My interpretation of Kangieser's testimony, as a whole, is that he premised his valuation of the tract on the fact of Exxon's condemnation. Kangieser's opinion testimony is therefore flawed because it is premised, without justification, on enhancement to the Zwahrs' land as a result of the taking. *See Fuller,* 461 S.W.2d at 598; *Religious of the Sacred Heart,* 811 S.W.2d at 737.

## F. Consequences

### 1. Kangieser's Testimony Erroneously Admitted

I would hold that the trial court erred by overruling Exxon's objections that Kangieser's testimony was inadmissible because it was unreliable. His methodology was flawed because there were no circumstances that warranted considering a pipeline easement as the highest and best use of the 1.01–acre portion of the Zwahrs' 49–acre tract of farmland. Kangieser's methodology was equally flawed because he did not observe the prohibition against basing his evaluation on enhancement resulting from Exxon's taking. For these reasons, under the fourth *Daubert* factor, which predominates here, as well as under well-settled law, Kangieser used methodology that does not apply to this partial-taking case, and thus cannot meet the test of general acceptance. Kangieser's testimony was, therefore, unreliable and inadmissible under rule 702 of the Rules of Evidence, and the trial court abused its discretion by admitting it over Exxon's objection. This error harmed Exxon because Kangieser's testimony is the only evidence that approximates the jury's damage award. *See* Tex.R.App. P. 44.1(a).

### 2. No Evidence and Rendition

Because Kangieser's testimony was inadmissible under rule 702, which precluded according it any weight, his testimony is "no evidence" under *Havner's* second category. *See Havner,* 953 S.W.2d at 711. Without Kangieser's testimony, there is no evidence to support the damages awarded by the judgment. Accordingly, the Zwahrs did not overcome the presumption that their use of their 49 acres as farmland is the highest and best use of their land. When the reviewing court determines that the only evidence supporting a verdict is "no evidence" that should have been excluded under *Daubert,* the reviewing court does not violate the plaintiff's right to jury trial by rendering judgment for the defendant. *Weisgram v. Marley Co.,* 528 U.S. 440, 120 S.Ct. 1011, 1018, 145 L.Ed.2d 958 (2000) (reconciling conflict on this issue in federal courts of appeal).

In *8.41 Acres of Land,* the Fifth Circuit concluded that the corporate landowners had the opportunity to prove the value of their land, but did not meet their burden because their evidence did not conform to the correct methodology and was therefore

inadmissible. *See* 680 F.2d at 395. Here, the Zwahrs had the same opportunity and did not meet their burden. Just as the Fifth Circuit found no reason to remand for a new trial to determine the market value of the corporations' tracts in *8.41 Acres of Land,* I find no reason to remand here. Although Exxon presented two experts who did not agree on the value of the land, counsel for Exxon stipulated, in oral argument, that it was willing to pay the Zwahrs the amount awarded by the Fort Bend County Commissioners, currently on deposit with the registry of the trial court. Accordingly, I would grant that relief. *See* TEX.R.APP. P. 43.6.

I would sustain Exxon's first and second issues and the portion of its fifth issue that challenges the legal sufficiency of the evidence to support the jury's verdict. Having thus concluded that "no evidence" supports the jury's verdict, I find no need to address Exxon's remaining points of error.

### Conclusion

I would reverse the judgment of the trial court and remand the cause for entry of judgment in favor of the Zwahrs in the amount of the Fort Bend County Commissioners' award.